**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**
No. 96-10027

AARON LEE FULLER,

                              Petitioner - Appellant,

versus

GARY JOHNSON, DIRECTOR, TEXAS DEPARTMENT OF
CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,

                              Respondent - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

May 30, 1997

Before JOLLY, WIENER, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

Aaron Lee Fuller, sentenced to death for the robbery, murder, and sexual assault of Loretta Stephens, appeals the district court's denial of his petition for writ of habeas corpus. We affirm.

I

The contemptible facts of this death penalty case need not detain us long. Most of the details are set forth in *Fuller v. State*, 829 S.W.2d 191 (Tex. Crim. App. 1992) (en banc), *cert.*

*denied* 508 U.S. 941, 113 S. Ct. 2418, 124 L. Ed. 2d 640 (1993). Loretta Stephens was beaten to death in her home during a theft, then sexually assaulted and dumped in the tall weeds on the side of Highway 87 north of Lamesa, Texas. During questioning by police, petitioner Aaron Fuller offered several different accounts of his involvement, some implicating one Juan Gomez. Fuller eventually confessed to murdering and sexually assaulting Ms. Stephens by himself, then disposing of the body without Gomez's knowledge.

When it became clear at trial that the state was seeking the death penalty, Fuller recanted his confession, seeking to implicate Gomez once again. Fuller's theory at trial was that Gomez beat Ms. Stephens to death with a six-inch metal pipe while Fuller went through her purse in another room. At the guilt/innocence phase of trial, prosecutors refuted this theory with autopsy evidence from Dr. Ralph Erdmann showing that Ms. Stephens's injuries were more consistent with blows from a fist than from a pipe. The State introduced physical evidence from Ms. Stephens's house tending to show that Fuller committed both crimes. The jury found Fuller guilty of capital murder.

At the punishment phase of the trial, the State introduced evidence as to Fuller's future dangerousness, including testimony by psychiatrist James Grigson that Fuller would represent a continuing threat to society. The State also introduced evidence that Fuller belonged to the Aryan Brotherhood, a violent neo-nazi

-2-

prison gang.  The jury sentenced Fuller to death.

Different courts stayed Fuller's execution while he exhausted both direct appeals and state petitions for habeas corpus.  He petitioned the federal district court for habeas corpus relief under 28 U.S.C. § 2254, and the district court denied his petition, vacated its stay of execution, and denied a certificate of probable cause.

Fuller now appeals, asserting five challenges to the constitutionality of his death sentence: (1) the state introduced false testimony regarding Ms. Stephens's autopsy; (2) the state introduced false testimony regarding future dangerousness; (3) the state did not prove that Fuller was a member of, or shared beliefs with, the Aryan Brotherhood prison gang, and therefore could not inject evidence of the group's beliefs into his murder trial; (4) the state improperly excluded a juror based on her views about the death penalty; and (5) the court wrongly refused his request for state-sponsored expert assistance.

II

Thirteen days after Fuller filed his appellate brief, the President signed into law the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA").  This new law modifies the statutes governing habeas corpus cases, providing for a one-year statute of limitations, requiring a "certificate of appealability" for circuit court review, and limiting successive habeas petitions.

The AEDPA amends 28 U.S.C. § 2253, which had imposed a jurisdictional requirement that a federal court issue a certificate of probable cause ("CPC") before a circuit court heard a habeas appeal. Section 2253, as amended, requires a district or circuit court to grant a "certificate of appealability" ("COA"), which must indicate which issues in a habeas appeal make a substantial showing of the denial of a constitutional right. We interpret Fuller's request for a CPC as an application for COA. *Drinkard v. Johnson*, 97 F.3d 751, 756 (5th Cir. 1996), *cert. denied*, ___ U.S. ___, 117 S. Ct. 1114, ___ L. Ed. 2d. ___ (1997). *Accord: Herrera v. United States*, 96 F.3d 1010, 1012 (7th Cir. 1996); *Reyes v. Keane*, 90 F.3d 676, 680 (2d Cir. 1996).

We grant Fuller's COA on four issues because he has made a substantial showing of the denial of a constitutional right in each. However, we deny COA on Fuller's challenge to the district court's denial of state-sponsored expert assistance on his habeas petition. We resolve doubts about whether to grant a COA in favor of the petitioner, *see Buxton v. Collins*, 925 F.2d 816, 819 (5th Cir.), *cert. denied*, 498 U.S. 1128, 111 S. Ct. 1095, 112 L. Ed. 2d 1197 (1991), and we may properly consider the severity of the penalty in making this determination. *See Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 3394 n.4, 77 L. Ed. 2d 1090 (1983); *Buxton*, 925 F.2d at 819. On the first four issues, Fuller raises questions that are debatable among jurists of reason, and he

-4-

has made an adequate showing to proceed further. *Clark v. Collins*, 956 F.2d 68, 71 (5th Cir.), *cert. denied*, 503 U.S. 901, 112 S. Ct. 1254, 117 L. Ed. 2d 485 (1992).

COA notwithstanding, the government argues that 28 U.S.C. § 2254(e)(2), as amended by AEDPA section 104, precludes our review of most of Fuller's first and second challenges. Amended section 2254(e)(2) provides that:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that))
> (A) the claim relies on))
> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

By its own terms, amended section 2254(e)(2) only curtails evidentiary hearings, not appellate review of cases, and in any event, the district court conducted an evidentiary hearing on these issues more than three months before the President signed the AEDPA into law. Therefore we find that the amended provision of section 2254(e)(2) does not affect our review of the merits, to which we now turn.

III

A

-5-

Fuller first claims that coroner Ralph Erdmann failed to perform the scientific procedures necessary to disprove Fuller's alternative theory that Gomez beat Ms. Stephens to death with a pipe, and that Dr. Erdmann's testimony was therefore fraudulent. At trial Dr. Erdmann testified that the injuries Ms. Stephens sustained were more consistent with infliction by fist than by pipe. Fuller introduces for the first time on habeas appeal the affidavit of Dr. Sparks Veasey, who claims that it is impossible to make that determination without stripping the dura and brain matter from the base of the skull to determine whether or not skull fractures were present. Dr. Veasey also contends that, based on photos of the autopsy, Dr. Erdmann did not strip the dura.

Dr. Erdmann also testified that he did not take a vaginal swab of the deceased to detect or analyze any semen because, he said, she had been dead too long to do a proper analysis. Dr. Erdmann testified that after eight hours sperm becomes undetectable. Dr. Veasey, however, testified in the evidentiary hearing that sperm would have been detectable well after eight hours following death. Fuller contends that Dr. Erdmann's testimony on both counts is false and misleading and that the State's use of such false testimony violates the Fifth, Eighth, and Fourteenth Amendments of the Constitution.

To establish a due process violation based on the government's use of false or misleading testimony, the defendant must show (1) that the witness's testimony was actually false, (2) that the

testimony was material, and (3) that the prosecution knew the witness's testimony was false. *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972); *May v. Collins*, 955 F.2d 299, 315 (5th Cir.), *cert. denied*, 504 U.S. 901, 112 S. Ct. 1925, 118 L. Ed. 2d 533 (1992). Fuller has failed to meet this burden.

Fuller has not shown that Dr. Erdmann's testimony about the cause of death was actually false. Dr. Erdmann testified that the bruises and cuts on the face of the deceased were more consistent with blows from fists than with blows from a pipe. Fuller had an opportunity at trial to challenge whether the autopsy provided sufficient evidence to reach Dr. Erdmann's conclusions, and he failed to do so. To dispute Dr. Erdmann's conclusion is not to prove that it is "false." Fuller has shown nothing about Dr. Erdmann's opinion to be actually false; he has only challenged the methods by which Erdmann reached those conclusions. The proper place for such a challenge is in cross-examination, not on collateral review.

Dr. Erdmann's statement at trial about the dissipation of semen evidence after eight hours may or may not be false. Even if Dr. Erdmann were incorrect, however, Fuller has not shown that Dr. Erdmann could have acquired semen evidence when police recovered Ms. Stephens's body, approximately 100 hours after the assault took place. So even if Dr. Erdmann were incorrect, Fuller has not shown

-7-

that Dr. Erdmann could have found exculpatory evidence material to his case. Additionally, Fuller has not demonstrated that the prosecution knew of the alleged falsity of Dr. Erdmann's claim about semen evidence. Therefore, Fuller has failed to show that he was denied a fair trial because of false and misleading testimony by Dr. Erdmann.

Fuller also asserts fleetingly that the introduction of Dr. Erdmann's "materially inaccurate" evidence violates his Eighth Amendment rights under *Johnson v. Mississippi*, 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988). Because Fuller has not adequately shown Dr. Erdmann's testimony to be false or material, Fuller's Eighth Amendment claim must fail.

B

Fuller next claims that the testimony of psychiatrist Dr. James P. Grigson regarding Fuller's future dangerousness was materially false, denying Fuller a fair trial under the Fifth, Sixth, Eighth and Fourteenth Amendments. At the sentencing phase of Fuller's trial, Dr. Grigson testified for the prosecution that, in his opinion, "there is absolutely no question, no doubt whatsoever" that Fuller would be dangerous in the future.

Labeled "Doctor Death" by some in the press, Dr. Grigson has been the target of media scrutiny. He has been profiled negatively in *Vanity Fair* and *The Washington Post*. The American Psychiatric Association has reprimanded him twice for his testimony, and it has

-8-

filed an *amicus curiae* brief with the Supreme Court urging the Court to prohibit his predictions because the association finds the predictions unreliable. Fuller also points to academic criticism of Dr. Grigson's predictions, in particular an article co-written by Dr. James Marquart in *Law and Society Review*.

Fuller claims that, because Dr. Grigson was aware of much of this criticism, he lied to the court when he testified as to the certainty of his predictions. Fuller also claims that the State knew or should have known that Dr. Grigson was unreliable and that his testimony as to the certainty of his predictions was false.

None of the criticism, by the media, scholars, or government agents, shows that Dr. Grigson lied to the court in this case. The defense could certainly use this outside criticism to impeach Dr. Grigson, but the criticism goes to the sufficiency of the evidence, a jury question, not the truth of his testimony. Fuller does not claim that Dr. Grigson lied about his own opinion, and Dr. Grigson never claimed at trial to be infallible. As we have already stated, *Giglio* requires that, in order to establish a due process violation for the government's use of false or misleading testimony, the defendant must show that the witness's testimony is actually false, material, and that the government knew the testimony was false. *Giglio*, 405 U.S. at 153-54, 92 S. Ct. at 766. Here, Fuller has failed to show that Dr. Grigson's opinions about future dangerousness, or about his own credibility, were actually

-9-

false, and therefore Fuller's due process claim fails.

C

Fuller contends that he was unconstitutionally prejudiced when the state introduced, as evidence of his future dangerousness, testimony that he was a member of the Aryan Brotherhood prison gang as well as testimony about the gang and its beliefs. At trial, the State introduced the testimony of one Royce Smithey, who testified that the gang was a white supremacist, neo-nazi-type gang that routinely dealt in violence, drug dealing, protection rackets, prostitution, and fear. Fuller asserts that the prosecution failed to show that he was a member of the gang or shared its beliefs. Fuller also argues that in any event the use of this evidence as an aggravating factor supporting the death penalty violated his First Amendment rights of freedom of belief and association.

The issue in this case is not whether the Aryan Brotherhood evidence was relevant to Fuller's future dangerousness in the sentencing phase, nor whether the evidence was more probative than prejudicial. Those are not constitutional issues but evidentiary issues, properly considered under the Texas Rules of Criminal Evidence on direct appeal. The fact that irrelevant evidence may have been admitted at trial does not rise to constitutional error. *Romano v. Oklahoma*, 512 U.S. 1, ___, 114 S. Ct. 2004, 2011, 129 L. Ed. 2d 1 (1994). The jurisdiction of this court on habeas review of a state prosecution is limited to constitutional issues under 28

U.S.C. § 2254(d)(1), as amended by the AEDPA.

The issue here is whether the State may use Fuller's constitutionally protected association as evidence of his future dangerousness. In *Dawson v. Delaware*, the Supreme Court held that, although the First Amendment protects an individual's right to join groups and associate with others, the Constitution does not erect a *per se* barrier to the admission of evidence concerning beliefs and associations at sentencing. *Dawson*, 503 U.S. 159, 161, 163, 112 S. Ct. 1093, 1096, 1097, 117 L. Ed. 2d 309 (1992). In that case, the Court held that, where both parties stipulated to the defendant's membership in the Aryan Brotherhood prison gang, but the prosecution offered no evidence of the gang's violent tendencies relevant to sentencing, the use of that associational evidence violated the defendant's First Amendment rights.

The *Dawson* court qualified its holding with an important caveat, however:

> Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance. In many cases, for example, associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society.

*Id*. at 166, 112 S. Ct. at 1098. Fuller's case is distinguishable from *Dawson* on exactly this point. The State in Fuller's case did not merely stipulate that Fuller was in the Aryan Brotherhood. It introduced evidence that Fuller was a member of a gang that had

-11-

committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults.  A reasonable juror could conclude that membership in such a gang is relevant to future dangerousness.  *Dawson* established that a state may not employ a defendant's abstract beliefs at a sentencing hearing when those beliefs are not relevant to the issue being tried.  In this case, however, Texas did not violate Fuller's First Amendment rights because it introduced relevant evidence of his future dangerousness.  The fact that Fuller was within his rights in joining the gang does not bar the use of relevant evidence at trial.

D

Fuller next asserts that the trial court improperly excluded for cause a qualified venire member based on her views on capital punishment.  During voir dire, venire member Jonnie White expressed reservations about imposing the death penalty unless the defendant was a repeat offender.  The colloquy between the district attorney and Ms. White was as follows:

> "[MR. SMITH, the district attorney]: If, after considering the evidence, you are convinced beyond a reasonable doubt that he is guilty of capital murder, then you as a juror, along with the other eleven, will then decide the answers to some questions. Basically two questions. If you answer those two questions yes, then he will be put to death.  If you answer either one of them no, or both no, he will serve a life sentence in the penitentiary.  But it will be one or the other, if he is found guilty of capital murder.
> "[MS. WHITE]:  Well, could I explain my answer on the

question, or should I just wait for your question.

"[MR. SMITH]: Go on and explain.

"[MS. WHITE]: About capital murder. Because my feeling about capital murder has always))I don't like taking a life for a life unless it is a case of a serial murderer who has murdered. So, I don't know what my feelings would be about a first time offense of capital murder.

"[MR. SMITH]: You understand that our law provides that there are certain crimes that are classified as capital murder.

"[MS. WHITE]: I know.

"[MR. SMITH]: And that))

"[MS. WHITE]: It doesn't matter how many murders; if it is one murder or ten, or more?

"[MR. SMITH]: Yes, ma'am.

"[MS. WHITE]: I understand.

"[MR. SMITH]: Are you saying that in your opinion that you could only consider the death penalty in a serial murder type case?

"[MS. WHITE]: Yes. That is what I am saying.

"[MR. SMITH]: And not in any other type case?

"[MS. WHITE]: Well, when I say serial, I am talking about))if that includes, you know, two or more. I don't know where you draw the line. I would draw it at two.

"[MR. SMITH]: Two previous killings?

"[MS. WHITE]: Yes. I mean, more than one.

"[MR. SMITH]: Is that the only situation that you could consider it?

"[MS. WHITE]: I think that's))

"[MR. SMITH]: I am not trying to))You are entitled to your opinion, absolutely. In your questionnaire you stated that in case of repeat offenders only. You used the word only. Is that your feeling about it, that those are the type cases, only?

"[MS. WHITE]: I don't know the answer to that. I think it would, but))If one murder is))I know))If it is proven definitely, beyond a reasonable doubt, I can't))I don't believe that I could))I could vote for a death penalty if it was for one))the first offense.

"[MR. SMITH]: Is that regardless of the facts of the case, whatever the facts might be?

"[MS. WHITE]: Well, if you are talking about someone who just kills in cold blood, I mean just))or if it is))or if it is accidental or under))under))there are all kinds of circumstances. Are you talking about premeditated murder, or something like that,

-13-

where someone plans someone's death?
"[MR. SMITH]:  Well, I am trying to determine))
"[MS. WHITE]:  Where I draw the line?
"[MR. SMITH]:  Yes, ma'am.  Where you draw the line.
"[MS. WHITE]:  Well, I think the only way I would know where I would draw the line, if I was just faced with it immediately, and I had to rely on my own judgment and instinct, I guess, too.  The way I feel now, I))I've never been in court before.  I've never served on a jury.  I have no))I don't have any idea at all how I will))I know that I could be a responsible citizen.  But the way I feel now, if I were asked to vote for a death penalty for someone who had committed one crime, even capital murder, I would go with my instincts to say that I would say for, maybe, life for imprisonment or a long sentence in prison.  I certainly would want a punishment.  But I don't think this))
"[MR. SMITH]:  I submit, Your Honor, that the juror should be excused."

After timely objection by the defense, the Court questioned Ms. White further.

"THE COURT:  You feel, Jonnie, as you sit here now, that you couldn't give the death penalty except where a person had been convicted of murder before, or that kind of crime before?
"[MS. WHITE]:  Yes.  That's the way that I feel.
"THE COURT:  All right.  I am going to excuse her."

Where a party seeks to exclude a venire member because of bias, that party must demonstrate through questioning that the potential juror lacks impartiality.  *Wainright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 852, 83 L. Ed. 2d 841 (1985) (citing *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 157, 25 L. Ed. 244 (1878)).  Opposition to capital punishment, in itself, is not sufficient cause for a judge to exclude a member of the jury pool.  As the Supreme Court stated in *Lockhart v. McCree*:

-14-

> [N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.

476 U.S. 162, 176, 106 S. Ct. 1758, 1766, 90 L. Ed. 2d 137 (1986).

The proper standard for determining when a court may exclude a venire member for cause because of her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath.'" *Witt*, 469 U.S. at 424, 105 S. Ct. at 852 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526, 65 L. Ed. 2d 581 (1980)). Where the court finds that even one juror was improperly excluded, the defendant is entitled to a new sentencing, because the right to an impartial adjudication is "'so basic to a fair trial that [its] infraction can never be treated as harmless error.'" *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S. Ct. 2045, 2057, 95 L. Ed. 2d 622 (1987) (plurality opinion); *see also Davis v. Georgia*, 429 U.S. 122, 123, 97 S. Ct. 399, 400, 50 L. Ed. 2d 339 (1976) (per curiam) (remanding capital case for reconsideration where a single juror was erroneously removed for bias).

The district attorney and the court established that Ms. White personally believed that only multiple murders merited capital punishment. Unfortunately, neither determined clearly that this view would impair her in answering the two special issues that

determine sentencing in Texas capital cases. The relevant question here is whether Ms. White could set aside her personal opinions and apply the law, or whether those beliefs would distort her view of the facts or alter her answers to the two special issues.

Ms. White stated several times her own views about what she considered the proper level of punishment for first-time murderers. But she also stated that she wanted to be a responsible citizen, that she could follow the law as the judge stated it, and that strong feelings of civic duty would make her do her best to render an impartial verdict. The district attorney's questions about where Ms. White would "draw the line" if she were the Texas legislature simply do not address the relevant question.[1]

The closest Ms. White came to revealing whether or not her views would influence her perception of the evidence or honesty in

---

[1] A more carefully crafted question and an answer clearly demonstrating bias may be found excerpted in our holding in *Riles v. McCotter*, in which the following exchange took place during voir dire:

COURT: . . . On the one hand, you tell me that you have this religious scruple against the infliction of death as punishment for crime. So, what I am asking you is, if that is the case, would the fact that the death penalty is a possibility affect the way you would answer any question involved in this lawsuit, up to and including, let's say, on the guilt or innocence))might you find it murder instead of capital murder so you wouldn't be faced with the death penalty?
MR. NIX: I am afraid I would have to say it would influence my way of thinking.

*Riles v. McCotter*, 799 F.2d 947, 949 n.2 (5th Cir. 1986).

answering the special issues was, at best, equivocal.  The trial

judge asked her, "You feel, Jonnie, as you sit here now, that you

couldn't give the death penalty except where a person had been

convicted of murder before, or that kind of crime before?"  Ms.

White responded, "Yes.  That's the way that I feel."  The trial

court found as a matter of fact that this answer indicated that Ms.

White would be biased against capital punishment and apparently

that her convictions would impair her decisionmaking.

A trial judge's finding of bias during voir dire is a

determination of fact, subject to a presumption of correctness on

collateral review, either under the old 28 U.S.C. § 2254(d),[2] *Witt*,

469 U.S. at 426-27, 105 S. Ct. at 853-54, or under the amended

provisions of the AEDPA.[3]  Although the record is not as clear as

---

[2]     Section 2254(d), before amendment by the AEDPA, provided:

In any proceeding instituted in a Federal court by
an application for a writ of habeas corpus by a person in
custody pursuant to the judgment of a State court, a
determination after a hearing on the merits of a factual
issue, made by a State court of competent jurisdiction in
a proceeding to which the applicant for the writ and the
State or an officer or agent thereof were parties,
evidenced by a written finding, written opinion, or other
reliable and adequate written indicia, shall be presumed
to be correct . . . .  [T]he burden shall rest upon the
applicant to establish by convincing evidence that the
factual determination by the State court was erroneous.

[3]     Amended 28 U.S.C. § 2254(e)(1) provides:

In a proceeding instituted by an application for a
writ of habeas corpus by a person in custody pursuant to
the judgment of a State court, a determination of a
factual issue made by a State court shall be presumed to
be correct.  The applicant shall have the burden of

-17-

we might like, the trial judge had enough evidence to make his own factual determination of bias based on the questioning of counsel and Ms. White's answers. *See Riles v. McCotter*, 799 F.2d 947, 949-50 (5th Cir. 1986) (venire member properly excluded for saying she could not impose the death penalty for murders that did not involve mutilation). Ms. White stated several times that she believed that capital punishment was inappropriate for the type of crime committed by Fuller, even though Texas law unambiguously made a single murder a capital offense. When the trial judge asked her if she felt that she "couldn't" give the death penalty for a first offense, she said, "Yes. That's the way I feel." She also said, "I don't believe that I could))I could vote for a death penalty if it was for one))the first offense." Fuller simply has not provided enough evidence to rebut the presumption that the trial court was correct. Therefore we will not upset the trial court's determination that the witness was biased and properly excluded from the jury.

E

Finally, Fuller contends that the court violated his constitutional rights by refusing his request for state-funded expert assistance under 21 U.S.C. § 848 (q)(4)(B).[4] In connection

_____

rebutting the presumption of correctness by clear and convincing evidence.

[4] Although a COA is required for habeas appeals, there is no such requirement for appeals under Section 848(q)(4)(B). *Sterling v. Scott*, 57 F.3d 451, 454 n.3 (5th Cir. 1995), *cert.*

-18-

with his district court habeas action, Fuller filed two *ex parte* motions for authorization to obtain expert assistance in preparation for an evidentiary hearing scheduled for December 13, 1995. Specifically, he sought the aid of a clinical and forensic psychologist and of a clinical and forensic pathologist. The district court requested that the government reply to Fuller's *ex parte* motions, and the court later denied both of Fuller's motions without discussion "for the reasons set forth in the Respondent's opposition." Judging from the government's briefs on the issue, the district court apparently decided that the experts, at best, could only offer proof about issues that were procedurally barred. The district court then denied Fuller's petition for habeas relief the day before the scheduled hearing, December 12, 1995. Curiously, the court conducted the evidentiary hearing on schedule the following day, even though it had already issued an order disposing of Fuller's petition. Fuller's counsel proceeded at the hearing without the requested expert assistance for his client. The record does nothing to explain this anomaly.

Two considerations convince us that Fuller was not denied a constitutional right as required for grant of COA. First, because he could not show substantial need for the assistance of the experts, Fuller was not entitled to their assistance under the

---

*denied*, ___ U.S. ___, 116 S. Ct. 715, 133 L. Ed. 2d 669 (1996); *Barnard v. Collins*, 13 F.3d 871, 878 n.6 (5th Cir.), *cert. denied*, 510 U.S. 1102, 114 S. Ct. 946, 127 L. Ed. 2d 363 (1994).

statute.  Second, Fuller was denied an *ex parte* hearing on his claims, but his relevant interests under the statute))namely the provision of experts where necessary))were not infringed.

In considering these two points, we first turn to the statute. Congress passed the Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, § 7001(b), 102 Stat. 4181, 4193-94 (1989) to amend section 408 of the Controlled Substances Act, 21 U.S.C. § 848, providing legal counsel and the assistance of experts for prisoners' section 2254 and 2255 challenges to capital sentences.  Title 21 U.S.C. § 848 (q)(4)(B) provides:

> In any post conviction proceeding under section 2254 or 2255 of Title 28, seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services *shall* be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

(emphasis added).  When the district court entertained Fuller's motions, Section 848(q)(9) added the following:

> Upon a finding in *ex parte* proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court *shall* authorize the defendant's attorney to obtain such services on behalf of the defendant and *shall* order the payment of fees and expenses therefore, under paragraph (10).

(emphasis added).  Paragraph 10 provides that the court shall fix reasonable rates for reasonable expenses.  21 U.S.C. § 848(q)(10).

In 1996, the AEDPA section 108 changed 848(q)(9), removing the

*ex parte* proceeding requirement and changing the mandatory "shall" language to the discretionary "may." AEDPA § 108, Pub. L. No. 104-132, 110 Stat. 1226 (1996). However, when the district court considered Fuller's motions, the AEDPA had not yet been passed, and it denied Fuller's requests under the old standard.

In light of the statutory language, we first note that Fuller did not show a substantial need for expert assistance. The Supreme Court has held that the language of section 848(q)(4)(B) "[o]n its face . . . grants indigent capital defendants a mandatory right to qualified legal counsel and related services" in any federal post conviction proceeding. *McFarland v. Scott*, 512 U.S. 849, 854, 114 S. Ct. 2568, 2571, 129 L. Ed. 2d 666 (1994) (footnote omitted). Claimants under the statute need only show indigence and that the services requested are "reasonably necessary." *See Lawson*, 3 F.3d at 753 (interpreting § 848(q)(4)(B) and 18 U.S.C. § 3006A(e)(1)). The government does not contest Fuller's indigence; indeed, the court allowed him to proceed *in forma pauperis*. However, the government asserts that clinical and forensic psychiatrists and pathologists were not necessary because their testimony would be procedurally barred. Fuller's motions do not say exactly how he would employ the experts in preparation for the evidentiary hearing, but he does not claim that they can show that any aspect of his trial violated Fuller's constitutional rights. In addition, Fuller's failure to raise these forensic issues at trial or direct

appeal bars their consideration in a collateral attack unless Fuller shows cause and prejudice or that a miscarriage of justice would result. *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 11-12, 112 S. Ct. 1715, 1721, 118 L. Ed. 2d 318 (1992). He has shown none of the above. Therefore we cannot say that the district court erred in its ultimate conclusion that the experts were reasonably necessary, regardless of its improper request for government briefing on the issue.

Second, the denial of *ex parte* hearings on this issue does not harm any substantial guarantees of the statute. The district court did not inquire into the necessity of expert aid, but instead invited the government, which was not a party in interest, to respond to the *ex parte* motion. The district court then summarily denied the request based on the government's response.

*Ex parte* proceedings, by definition, are "taken or granted at the instance and for the benefit of one party only, and without notice to, or contestation by, any person adversely interested." Black's Law Dictionary 576 (6th ed. 1995). The district court's disregard of section 848(q)'s *ex parte* proceeding requirement and the court's reliance on the government's response were improper in this case.

The question of whether failure to provide *ex parte* proceedings as guaranteed by section 848(q) constitutes reversible error is an issue of first impression for this Circuit. The Fourth

Circuit has declared that *ex parte* proceedings are the "only proper means of adjudicating appointment motions" under the section, but then held that the district court's adversary hearing on the petitioner's section 848(q) motion was not reversible error. *Lawson*, 3 F.3d at 751-52. The *Lawson* court held that certain "countervailing considerations" made the hearing a "justifiable attempt to ensure that the factual allegations supporting Lawson's petition" had been fairly presented. *Id.* at 752.

In an unpublished opinion, the Ninth Circuit granted a writ of mandamus, ordering a district court to vacate its habeas ruling and to grant petitioner assistance under section 848(q). *Daniels v. United States Dist. Court for Cent. Dist. of California*, 76 F.3d 385 (1995) (table). The district court in *Daniels* appointed a psychiatric expert to determine whether a psychiatrist was necessary to his habeas case. Apparently holding this to be reversible error, the Ninth Circuit issued an unpublished opinion granting a writ of mandamus directing the district court to provide assistance. The Ninth Circuit then withdrew that opinion, granted rehearing, then issued a superseding table opinion granting the writ of mandamus again. *See Daniels v. United States Dist. Court for Cent. Dist. of California*, No. 94-70295, 1995 WL 419148 at *6 (July 18, 1995) (opinion withdrawn). The fact-specific opinion of the Fourth Circuit and table opinion of the Ninth Circuit give us little guidance on this question.

Although this circuit has not yet addressed the precise issue here, we have held that it was reversible error to misconstrue the analogous appointment provision of the Criminal Justice Act, 18 U.S.C. § 3006A(e), which requires that decisions on expert appointment be made "after appropriate inquiry in an ex parte proceeding."  18 U.S.C. § 3006A(e)(1); *United States v. Hamlet*, 456 F.2d  1284, 1285 (5th Cir. 1972) (per curiam) (trial court erred in denying section 3006A motion without conducting the *ex parte* inquiry required by statute);  *United States v. Theriault*, 440 F.2d 713, 715 (5th  Cir. 1971) (same).  In the section 3006A(e) context, we  have  remanded  to  the  district  court  for  adherence  to  the statute.  *Hamlet*, 456 F.2d at 1285; *Theriault*, 440 F.2d at 715.

However, the guarantees of section 3006A(e) are distinct in at least one important respect: the statute provides a defendant expert assistance for preparation for his trial, and provision of those statutory guarantees therefore takes on a constitutional dimension not present in collateral habeas corpus proceedings. *Compare Theriault*, 440 F.2d at 716-717 (Wisdom, J., concurring) (invoking indigent criminal defendant's constitutional right to court-appointed experts to assist with defense) *with Murray v. Giarratano*, 492 U.S. 1, 10, 109 S. Ct. 2765, 2770, 106 L. Ed. 2d 1 (1989) (holding that even capital prisoners have no constitutional right to counsel in habeas cases).  The fact that there is no constitutional right at stake in the district court's failure to

provide *ex parte* proceedings in the habeas context counsels against vacating the district court's decision on so narrow a ground.

The district court, in our view, should have allowed Fuller to demonstrate the need for expert assistance. It failed both in not discussing the necessity of the experts and in allowing the government to interfere in what should have been an *ex parte* determination. That the court dismissed Fuller's motion so summarily and on the sole basis of the government's (improper) rebuttal is particularly troubling. However, because the court was ultimately correct in holding that such experts were not "reasonably necessary," because Fuller had no constitutional right to an *ex parte* hearing, and because the district court on remand could ratify its earlier ruling by reciting the reasons briefed by the government, we hold that the district court's unorthodox procedure in denying Fuller's motion is harmless error, not the denial of a constitutional right. Therefore we deny COA on this issue.

IV

For the foregoing reasons, we GRANT Fuller's application for a COA on all issues but the last, and we AFFIRM the district court's denial of Fuller's petition.