**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-10252

BOBBY LEE HINES,

Petitioner, Appellant,

VERSUS

JANIE COCKRELL, Director, Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

Appeal from the United States District Court
For the Northern District of Texas, Dallas Division

(3:99CV-0575-G)

December 31, 2002

Before EMILIO M. GARZA, DeMOSS, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Bobby Lee Hines was convicted of capital murder and sentenced
to death by the Texas state courts for the murder of Michelle Wendy
Haupt. He now petitions this court for a Certificate of
Appealability (COA) to pursue his habeas corpus claims as required

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this
opinion should not be published and is not precedent except under
the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

by 28 U.S.C. § 2253(c)(1) for claims denied by the district court. Specifically, Hines argues that reasonable jurists would find debatable the district court's conclusions that (1) the trial court did not err in denying Hines a continuance to allow his expert to conduct DNA testing, and (2) that the state habeas court did not err in failing to appoint a DNA expert to aid Hines in preparing his state habeas application. Hines also argues that the district court erred in not giving him funds for an independent DNA test during his federal habeas proceeding as it is permitted to do under 21 U.S.C. § 848(q).[1] For the reasons below we deny petitioner all relief sought.

## I. FACTS AND PROCEDURAL HISTORY

On October 19, 1991, Mary Ann Linch went to the apartment of her friend Michelle Wendy Haupt in Carrollton, Texas to spend the weekend. Linch brought with her a Marlboro cigarette carton in which only four packs remained. She had purchased the cigarettes at Brookshires' in Corsicana, Texas, and the carton contained a stamp showing "Brookshires' Store" on the side. Linch left the carton at Haupt's when they left that evening to go to a nightclub. Linch had intended to return to Haupt's, but instead spent the night with another friend.

Linch testified that when they went to the club, Haupt was wearing a gold sand-dollar charm necklace which she always wore.

---

[1]Hines does not need a COA to pursue this claim. Fuller v. Johnson, 114 F.3d 491, 501 n.4 (5th Cir. 1997).

2

During the evening, Haupt became ill.  Another friend drove Haupt back to her apartment and then left.  He testified that Haupt locked the door behind him.

Meanwhile, at Haupt's apartment complex, Hines appeared uninvited at a party.  When the hostess asked him who he was, he identified himself as the brother of the apartment manager.  He told another guest that he was part of the maintenance crew at the complex.  He pulled out a ring of keys and stated that he could get into any apartment he wanted to at any time.

At approximately 6:00 a.m. on October 20, 1991, Haupt's next-door neighbor heard a woman screaming.  He could not determine the source of the screams, but his wife called the police.  Two police officers were dispatched to the scene, but the screaming had ended before they arrived.  After inspecting the premises, the officers could not determine where the screams had come from and they eventually left.  Two other residents in the apartment directly below Haupt's also heard screaming loud enough to awaken them.  One of the residents testified that he also heard other loud noises that sounded "like a bowling ball being dropped on [Haupt's] floor." He heard this noise at least 20 times.  The screaming lasted for approximately 15 minutes.  The resident of an adjacent downstairs apartment also heard the screaming.

Just before noon that morning, the residents discussed what they had heard and became concerned for Haupt.  Eventually, the apartment leasing manager was persuaded to check Haupt's apartment.

3

After knocking and receiving no answer, the manager opened the door and saw Haupt lying on the floor just inside the door.  The cord was around her neck, her face was black, and she appeared to be dead.  The manager had someone call an ambulance.

Haupt was found dressed in only a robe and lying face up on the floor.  There were puncture wounds to her chest area and the cord from the stereo was wrapped around her neck.  The robe was stained with blood, but it had no holes to correspond with the puncture wounds to Haupt's body, indicating the robe was placed on her body after the wounds were inflicted.  Further, the belt to the robe was tied tighter than a person would normally tie it against her own body.  An object appearing to be an ice pick was found on the nearby couch.  Hines' fingerprint and bloody palm print were found within the apartment.

Dr. Jeffrey Bernard, the Dallas County Chief Medical Examiner, testified that the cause of Haupt's death was strangulation and puncture wounds.  She had stereo speaker wire drawn tightly around her neck, abrasions to her neck and jaw, contusions on her neck and a fractured hyoid bone.  She had approximately 18 puncture wounds to her chest, right flank area, her back, the interior wall of her vagina, her left upper extremity, and her right thigh.  She further had rectal tears with hemorrhaging. Barnard testified that the puncture wounds could have been made by the object found on the couch.

Later the same day, Hines was found to be in possession of

Haupt's gold sanddollar charm. He had blood on some of his clothing, as well as scratches under his eye, and on his neck and cheek. Other objects from Haupt's apartment, including the Brookshires' cigarette carton, were found under the couch where Hines had been sleeping.

Hines was convicted of capital murder on March 19, 1992, and sentenced to death. His direct appeal was denied by the Texas Court of Criminal Appeals in May 1995 in an unpublished opinion. Hines v. State, No. 71,442 (Tex. Crim App. May 10, 1995) (unpublished). His state habeas application was also denied by the Texas Court of Criminal Appeals in another unpublished opinion. Ex Parte Hines, No. 40,347-01 (Tex. Crim. App. 1999) (unpublished). The federal district court for the Northern District of Texas then denied Hines' federal habeas relief, as well as his request for a COA to our court.

## II. STANDARD OF REVIEW

A habeas petitioner cannot appeal the denial of habeas relief from the district court unless he obtains a COA. 28 U.S.C. § 2253(c)(1). Since Hines filed his habeas application after April 24, 1996, the rules for COA review are governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Lindh v. Murphy, 521 U.S. 320, 336 (1997). "Under AEDPA, a COA may not issue unless 'the applicant has made a substantial showing of the denial of a constitutional right.'" Slack v. McDaniel, 529 U.S.

5

473, 483 (2000) (citing 28 U.S.C. § 2253(c)(2)). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," or, at least, that the "issues presented were adequate to deserve encouragement to proceed further." Id. at 484; Moore v. Johnson, 225 F.3d 495, 500 (5th Cir. 2000). Although the nature of the penalty in a capital case is an appropriate consideration in evaluating a COA application, "the severity of the penalty does not, in and of itself, *require* the issuance of a COA. However, in capital cases, doubts as to whether a COA should issue must be resolved in favor of the petitioner." Clark v. Johnson, 202 F.3d 760, 764 (5th Cir. 2000) (citations omitted); Lamb v. Johnson, 179 F.3d 352, 356 (5th Cir. 1999).

To obtain habeas relief, a petitioner must either demonstrate that the state court's decision "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court's decision is "contrary to" clearly established federal law if it "arrives at a conclusion opposite to that reached by th[e] [Supreme] Court on a question of law or if

6

the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Id. A state court's decision is an "unreasonable application" of federal law "if the state court identifies the correct governing legal principle from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. A state court's determination of factual issues are presumed correct and the applicant bears the burden of rebutting the presumption with clear and convincing evidence.

### III. TRIAL CONTINUANCE

Hines first seeks a COA for his claim that the trial court violated his constitutional right to due process and effective assistance of counsel by denying him a trial continuance following jury selection to allow his DNA expert, Dr. Arthur J. Eisenberg, to conduct independent testing of blood samples found on Hines' pants and underwear. The government subjected those samples to a serology test that found the blood contained A antigens, and therefore could not have come from the victim. The subsequent government DNA test matched the blood sample with the victim's, however, and Hines sought a ten-week continuance to conduct an independent DNA test to resolve this discrepancy. The trial court denied this continuance, and Hines now argues this denial was unconstitutional.

When a denial of a continuance is the basis of a claim for

7

habeas relief, for relief to be granted not only must the trial judge have abused his discretion, but the denial must have been "so arbitrary and fundamentally unfair that it violates constitutional principles of due process." Hicks v. Wainwright, 633 F.2d 1146, 1148 (5th Cir. 1981). Here, petitioner claims that the denial violated his due process right to present an effective defense as guaranteed in Ake v. Oklahoma, 470 U.S. 68, 76-77 (1985). In Ake the Supreme Court held a criminal defendant's due process rights include the right to expert assistance where such help is necessary to give indigent defendants "an adequate opportunity to present their claims fairly within the adversary system." Id. at 77, *quoting* Ross v. Moffit, 417 U.S. 600, 612 (1974). Hines argues that by denying the continuance, the trial court robbed him of his ability to effectively use Dr. Eisenberg, thereby depriving him of the opportunity to mount an adequate defense.

The Texas state courts and the district court offer compelling reasons why this claim fails. First, the state habeas court concluded that Hines did in fact receive expert assistance as required by Ake. Dr. Eisenberg testified at trial about the shortcomings in the prosecution's DNA evidence, including the inconsistency with the serology test results, as well as the fact that the DNA test could not exclude that the blood on Hines' clothes was that of his roommate Jimmy Knight. Dr. Eisenberg also assisted the defense in preparation of its cross-examination

8

questions, including questions to the State's serologist Michele Skidmore that attempted to discredit her theory that the A antigens came from Hines' sweat. Thus, even without additional testing, the state habeas court concluded the defense was able to use Dr. Eisenberg to raise reasonable doubt in juror's minds about the state's blood evidence.

Hines fails on appeal to introduce evidence that suggests this conclusion of the state habeas court was an unreasonable application of or contrary to established Supreme Court precedent. Hines argues that had Dr. Eisenberg conducted additional testing, it would have provided evidence consistent with the theory that Hines is innocent, and inconsistent with the government's test results. While such speculative benefits are possible, Hines forgets the admonishment of the Court in Ake that the state need not buy the indigent defendant all the assistance a wealthy man might get. Ake, 470 U.S. at 77. Rather, the test is whether the defendant was given an adequate opportunity to present his claims at trial. Here, Dr. Eisenberg's testimony regarding the shortcomings in the state's DNA evidence, as well as his assistance in drafting cross-examination questions of the state's DNA and serology witnesses, gave Hines such an opportunity. Thus, Hines fails to develop the factual or legal basis of a valid Ake claim.

Assuming arguendo that Eisenberg's assistance to defense counsel was somehow inadequate, Hines has not demonstrated that he had the constitutional right to further DNA testing. As we

9

explained in <u>Yohey v. Collins</u>, 985 F.2d 222, 227 (5th Cir. 1993) non-psychiatric experts should be provided only if the evidence is "both critical to the conviction and subject to varying expert opinion." <u>Id.</u> (citations omitted). In denying Hines' claim on direct appeal, the Texas Court of Criminal Appeals concluded that petitioner failed to establish that additional DNA testing met the second prong of this test. It explained that Hines did not introduce evidence suggesting that further testing would produce a contrary result. In reaching this conclusion the state court noted that Dr. Eisenberg had testified that he believed that the government's tests were conducted using proper procedures, suggesting further DNA testing would not produce different results. In finding this conclusion was not an unreasonable application of or contrary to established Supreme Court precedent, the district court added its own doubt that prong 1 of the test had been met, concluding that evidence as to the source of the blood on Hines' clothes was not "critical" to his conviction. The district court came to this conclusion after considering the volume of other evidence against Hines, including his bloody palm print on Haupt's wall.

Hines argues that reasonable jurists would debate both of these conclusions. As to the former, Hines claims that the inconsistencies between the government DNA results and the serology report were sufficient to suggest that the results of a second DNA test might be different than the first. As to whether the evidence

was "critical" to conviction, Hines argues that contrary DNA evidence would have given him three benefits critical to his defense. First, the testing might have established the government's DNA evidence was too unreliable to be admitted.[2] Second, the test could have impeached Dr. Robert Giles, the government DNA expert. Finally, the results could have created rebuttal evidence consistent with the theory that Hines is innocent.

Hines' arguments do not lead us to believe that reasonable jurists would debate the district court's conclusions. To be entitled to non-psychiatric expert assistance a defendant must show something more than a mere possibility that the desired assistance will be helpful. Yohey, 985 F.2d at 227. In this case Hines has not shown that there is more than the mere possibility that additional DNA testing would produce different results. Given the testimony of Skidmore that the contrary serology results were caused by Hines' sweat, those results are insufficient to suggest that further DNA tests would produce a different result. Further, as the state court on direct appeal noted, defendant's expert admitted that the state procedures for the DNA test were adequate.

---

[2]Under Texas Rule of Criminal Evidence 702, expert testimony is only admissible if it is reliable and on balance is of assistance to the trier of fact. Kelly v. State, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). Such evidence is reliable if (a) the underlying scientific theory is valid; (b) the technique applying the theory is valid; and (c) the technique was properly applied in the case in question. Id. at 573.

11

This suggests that a second test likely would have produced the same results.

Hines has also not shown that the evidence from the second DNA test would have been critical evidence at trial. As the district court correctly noted, the State has other scientific evidence tying Hines to Haupt's apartment, including his bloody palm print on her wall. Additionally, the State had circumstantial evidence linking Hines to Haupt, as he had her belongings in his possession. Thus, the DNA link of Haupt to Hines' clothes does not seem critical to the conviction. Moreover, even if the additional test produced contrary results, it would not have resulted in exclusion of the government's DNA test, as by defendant's own admission the government DNA test used proper techniques.[3] At most it would have produced additional impeachment evidence.[4] Given that Dr. Eisenberg already presented such evidence, we cannot conclude that

---

[3]As noted above, the test for reliability for admission of expert testimony is whether (a) the underlying scientific theory is valid; (b) the technique applying the theory is valid; and (c) the technique was properly applied in the case in question. Kelly, 824 S.W.2d at 573. As DNA evidence meets the first two prongs of this test in Texas, id. at 574, and defendant's expert admits it was properly applied here, the evidence would have been admissible regardless of contrary test results produced by Eisenberg.

[4]Hines argues that a DNA test showing the blood on his clothes was not Haupt's would be independent evidence of his innocence. He argues that the blood was instead that of his roommate Jimmy Knight. But Hines has failed to explain how the fact that the blood belonged to Jimmy Knight, or anyone else other than Haupt for that matter, would exonerate him, as such evidence is in no way probative of innocence. At most, it would discredit one piece of the government's case, which when considered in the context of the volume of other evidence against Hines, is not critical.

12

additional impeachment evidence meets the "critical" threshold.

Accordingly, Hines' request for a COA on this claim is denied.

## IV. STATE HABEAS ERRORS

Hines next seeks a COA for his claim that the state habeas court erred by not hiring him a DNA expert to assist in preparation of his claim, thereby depriving him of due process and effective assistance of counsel. The district court denied Hines relief on this claim on alternative grounds. First, it addressed the merits of the claim, and concluded it was not unreasonable for the state court to deny Hines access to an expert to develop his claims. In the alternative, the district court held that the claim of error in the state habeas proceeding was not cognizable on federal habeas, as the claim was an attack on a proceeding collateral to the detention rather than the detention itself.

Errors and deficiencies in state habeas proceedings cannot form the basis of relief in a federal habeas application. Trevino v. Johnson, 168 F.3d 173, 180 (5th Cir. 1999). Hines argues reasonable jurists would debate the district court's application of this straightforward rule because the Texas state constitution guarantees petitioners the right to "competent counsel" in state habeas proceedings. This state created right to habeas counsel creates a federal constitutional right to effective counsel, Hines reasons.

Hines' argument is unavailing, as we rejected this exact

13

argument in In re Goff, 250 F.3d 273 (5th Cir. 2001). There we explained that under Pennsylvania v. Finley, 481 U.S. 551 (1987), states that choose to provide petitioners counsel in state post-conviction proceedings are not obligated to ensure that counsel meets constitutional minimums for defense attorneys at trial or on direct appeal. In re Goff, 250 F.3d at 275. The reason, we explained, was that, "the Constitution does not put the State to the difficult choice between affording no counsel whatsoever," or following strict constitutional guidelines for the counsel it provides. Id., *quoting* Finley, 481 U.S. at 559. Thus, as Texas was under no obligation to provide Hines with counsel for his state habeas proceeding, the ineffective assistance of that counsel, or counsel's failure to meet minimum due process standards, cannot form the basis of federal habeas relief. Hines' request for a COA on this claim is denied.

## V. DISTRICT COURT FUNDING OF DNA TESTS

In his final point of error Hines argues the district court wrongly denied him funds to conduct a new DNA test on the blood evidence to aid his federal habeas application as allowed under 21 U.S.C. § 848(q)(9). That section states:

> Upon a finding that investigative, expert, or other services are **reasonably necessary** for the representation of the defendant, whether in connection with issues relating to guilt or the sentence, the court may authorize the defendant's attorneys to obtain such services on behalf of the defendant and, if so authorized, shall order the payment of fees and expenses ...

14

21 U.S.C. § 848(q)(9) (emphasis added). In denying Hines funds under this section, the district court concluded that Hines had not shown that the requested assistance would aid him in the development of a viable habeas claim. It rejected his argument that testing would aid in developing the trial continuance claim above, concluding that claim lacked merit.

We review the district court's determination to deny expert funds under 21 U.S.C. § 848(q)(9) for an abuse of discretion. See Clark, 202 F.3d at 765-66 (noting that district court's determination whether to take additional evidence is reviewed for abuse of discretion). Hines argues that the district court abused its discretion in denying the funds because a DNA test was reasonably necessary for him to prove that the DNA test results were "subject to varying expert opinion," as required by Yohey, 985 F.2d at 227.

Assuming arguendo that Hines is correct that the tests were reasonably necessary to establish that a second DNA test at trial would have produced different results, we still cannot conclude that the district court abused its discretion. We explained in Fuller, 114 F.3d at 502 (5th Cir. 1997), that for a request for funds to be "reasonably necessary" for a claim, a petitioner must demonstrate how those results can show that any aspect of his trial was constitutionally flawed. Hines argues that the requested test could show that he was constitutionally entitled to a trial

continuance under <u>Yohey</u>.  But to make a valid <u>Yohey</u> claim, not only does Hines have to show that additional DNA testing might have produced different results, but also that the results would have been critical evidence at trial.  As we noted above, Hines cannot do so.  Accordingly, we affirm the district court's denial of Hines' funding request.

## VI.  CONCLUSION

Because Hines has failed to show that reasonable jurists would debate the conclusions of the district court, his requests for a COA are DENIED.  In addition, because Hines has not shown that the trial court abused its discretion in denying him funds for expert testing, the district court's denial of Hines' funding request is AFFIRMED.

DENIED; AFFIRMED.