

DA 10-0026

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 92

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

TIMOTHY MICHAEL WRIGHT,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
                    In and For the County of Gallatin, Cause No. DC-08-20 AX
                    Honorable Mike Salvagni, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Nancy G. Schwartz, NG Schwartz Law, PLLC, Billings, Montana

        For Appellee:

                Steve Bullock, Montana Attorney General, Sheri K. Sprigg, Assistant
                Attorney General, Helena, Montana

                Marty Lambert, Gallatin County Attorney, Ashley Whipple, Deputy
                County Attorney, Bozeman, Montana

Submitted on Briefs:  December 15, 2010

Decided:  May 3, 2011

Filed:

_____
                        Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1     Timothy Michael Wright was convicted of sexual intercourse without consent following a three-day jury trial in the Eighteenth Judicial District Court, Gallatin County. He now appeals, arguing that his right to due process was violated by the false and misleading presentation of DNA evidence, and also that he received ineffective assistance of counsel. We affirm Wright's conviction but dismiss, without prejudice, his ineffective assistance of counsel claim. He may pursue that claim through a timely petition for postconviction relief.

## BACKGROUND

¶2     The evening of January 11, 2008, Wright picked up Sierra (the victim in this case) for their first or second date. They had known each other for about six months but had just recently begun a dating relationship. That evening, they went to various bars in the Bozeman area and spent time socializing at the home of Wright's employer. Wright and Sierra consumed several beers and so-called "Jägerbombs"—a mixture of Jägermeister and Red Bull. They also smoked some marijuana.

¶3     At around midnight or 1:00 a.m., Sierra asked Wright to drive her home. They got into the pickup Wright had borrowed for the evening and headed toward Belgrade, where they both lived. Along the way, Sierra felt lightheaded and laid down with her head on Wright's lap. They continued to converse, and Sierra told Wright that she was not looking for sex, but was looking for a relationship.

¶4     While Wright's and Sierra's stories are consistent as to the foregoing events, they diverge as to what happened next. According to Wright, he took the Interstate 90

2

frontage road from Bozeman to Belgrade. Along the way, Sierra told him that she needed to go to the bathroom. Thus, Wright stopped at his parents' house in Belgrade so she could use the restroom there.

¶5 According to Sierra, however, Wright drove to the Cameron Bridge Fishing Access, which is along a different route from Bozeman to Belgrade. When Sierra sat up and saw where they were, she asked Wright, "What are you doing? I thought you were going to take me home?" He responded, "I'm going to give you just what you don't want." Wright told Sierra to take her clothes off, and when she refused, he took the keys out of the pickup's ignition and held them to Sierra's throat. With his other arm, he took Sierra's pants and underwear off and forced his penis into her vagina. Sierra pleaded with Wright to stop. She stated, "You don't want to do this. You don't want to do this, Tim. Think about your children and my son." She tried to push Wright off her, but he was too strong. She reached for her cell phone in her coat pocket to call 911, but Wright realized what she was doing and threw the phone in the back seat of the pickup.

¶6 Eventually, Wright stopped raping Sierra and stated, "I can't believe I just did this to you. I care about you and I like you." Sierra asked whether he had ejaculated, and he responded, "No." She asked Wright to drive her home, but he stated, "I'm not going to take you home because I don't want to go to jail." Sierra then suggested that he instead take her to his house so they could cuddle and talk. (As Sierra later explained at trial, she made this suggestion because she knew that Wright lived with his parents and she figured that if she could get there, she could get help.) Wright agreed and drove toward his parents' house. Sierra sat right next to him in an effort to make him think that everything

was okay and that she was not going to report him. When they reached his parents' house, Wright initially refused to stop, but Sierra convinced him that she needed to go to the bathroom and get a drink of water. Once inside, Sierra used the restroom and then, while Wright was distracted by his dogs, she "bolted" into his parents' bedroom and woke them up.

¶7 According to Sierra, she told Wright's dad (Jeffrey Rapp) that his son had just raped her, and Rapp responded, "Well, call the cops." According to Rapp, in contrast, Sierra told him to "take me home right now or I'm going to call the police and say that Tim tried to rape me." In any event, Rapp refused to take Sierra anywhere. At her request, however, Rapp went out to Wright's pickup and retrieved Sierra's cell phone from the back seat. Sierra then used it to call 911 and report the rape. She remained in Rapp's bedroom on the phone with the 911 dispatcher until Sergeant Chuck Sprague with the Belgrade Police Department arrived.

¶8 Sprague observed that Sierra "was terrified, she was crying, she was shaking. I mean I could feel her trembling through my arm. She was clutching my arm so tight it actually hurt. She just kept saying 'Get me out of here. Get me out of here. I want to leave.' . . . She didn't seem like she felt safe to me, so that became my focus was getting her out of the house immediately." Sprague took Sierra to the hospital for a rape examination. The nurse who conducted the exam observed five areas of red, raised, linear lines, plus a round area of redness, on Sierra's neck. The nurse also noted burst blood vessels, indicating that quite a bit of force had been used. In examining Sierra's genital area, the nurse observed a reddened area with indications of broken blood vessels

4

on the inner left side of her vagina, a couple of inches past the opening, possibly caused by blunt force trauma.

¶9    Based on Sierra's report, investigators went to the Cameron Bridge Fishing Access.  There, they observed an area of melted snow which was consistent with a map Sierra had drawn showing where the truck was parked during the rape.  They also saw tire tracks in the snow.  The tread patterns of these tracks indicated that the vehicle had two different sets of tires.  The investigators compared these tread patterns to the tires on Wright's pickup and found them to be consistent.

¶10    No semen was found in Sierra's vagina.  Very small amounts of sperm were found on her underwear, but Wright was specifically *excluded* as the contributor.  When asked to explain the presence of this sperm, Sierra opined that it may have come from a guy with whom she had been sexually active a week or two earlier, or it may have transferred from her roommate's clothes in the wash.

¶11    The DNA evidence at issue in this appeal consists of testimony about a penile swab which investigators obtained from Wright.  Jennifer Revis, a forensic scientist with the Department of Justice's Forensic Science Division, analyzed the swab and compared it against reference samples provided by Wright and Sierra.  Revis was then called at trial to testify about the findings set out in her DNA Report.  At the outset, the prosecutor asked Revis how many times she had testified before in court, and Revis replied, "[T]wice."  With regard to the penile swab, Revis stated that she had developed a DNA profile from epithelial cells and that this profile reflected a mixture of at least two individuals.  The "major profile" in the mixture matched the DNA profile of Wright's

reference sample, which was expected given that the sample had come from his penis. Revis then testified that "[Sierra] cannot be excluded as a possible contributor to the mixed DNA profile," after which the following colloquy ensued:

> Q.      When you're determining whether or not [Sierra's] DNA is on that penis, tell me what the language "cannot be excluded" means?
> A.      So that means that the 16 locations we looked at for a DNA profile was at every of those 16 locations.
> Q.      So whose DNA is on that penis, that penile swab that you examined at the Lab?
> A.      Well, it -- Timothy Wright and [Sierra] can't be excluded as contributing to that profile.
> Q.      If you -- if you're finding her DNA, how come your conclusion isn't that she's included in the profile?  That confuses me.
> A.      At the Forensic Science Division we don't use the word "included."  Instead we use "cannot be excluded."  It basically means the same thing.  It's just our terminology we use.

¶12     The prosecutor next inquired about Revis's statement in her DNA Report that, "[b]ased on national statistics, the estimated number of unrelated people in a random population expected to have a DNA profile that could be included in this mixed DNA profile" is 1 in 467,700 Caucasians, 1 in 2,351,000 Southwestern Hispanics, and 1 in 3,504,000 African-Americans:

> Q.      Can you explain -- let's focus on the Caucasian statistic.  Can you explain that statistic to the jury?  What's it really mean?
> A.      So that means that in a population of 467,000 you would expect that one person in that population could be included in this mixture.
> Q.      All right. How many -- what's the population of the state of Montana, do you know?
> A.      It's approximately a million, just under.
> Q.      So in this particular scenario we've got a mixture of two DNA's, right?
> A.      Yes.
> Q.      Statistically speaking, then, I'm just -- I want to make sure I understand you, is there only -- are there only two people in the state of Montana that can contribute those particular profiles?

A. Yes. Statistically looking at the state of -- or the population of Montana two people in Montana would contribute to this mixture.

Q. Those being whom according to your test results?

A. According to the test results Timothy Wright and [Sierra].

¶13 Thereafter, defense counsel cross-examined Revis on her DNA analysis of the penile swab as follows:

Q. The 16 loci, those are -- those basically are marker points on our DNA [strand]; is that fair?

A. Yes.

Q. They are, in fact, junk DNA, are they not, junk markers?

A. Yes. They don't code for anything important like your hair color or your race or anything like that. So they're just basically junk DNA.

Q. Now, how many -- in a human DNA strand, how many of those little points are there possible?

A. Oh, it's limitless.

Q. Millions?

A. Yeah, uh-huh.

Q. Okay. So when you do your analysis you pick just certain spots that you're testing to see where that person's genetics hit, ping, -- and it goes ping, ping, ping, ping, ping, correct?

A. Yes.

Q. Like that? Okay. Now, you have to have all 16 of those loci in order to be able to tell if that's an exact DNA match, correct?

A. For an exact match, yes.

Q. Did you have an exact match on -- with [Sierra] in the penile swab?

A. She can't be excluded. Since it's a mixture we use the "can't be excluded" from the mixture term.

Q. Did you find all 16 loci of [her] DNA on Mr. Wright's penis?

A. Yes, I did.

Q. Okay. Now, could some of those loci be from his DNA? It's a mixed sample. You've got sperm. You said that you separate out the sperm cells from the epithelial cells, right?

A. This -- the sample that we're talking about is the epithelial cell fraction, so it's non-sperm DNA and both Timothy Wright and [Sierra] were in that mixture.

Q. Okay. Now, above when you say that Timothy [Wright] was the contributor, but then down below was Sierra, you say that she cannot be excluded.

7

A. That's because with Timothy Wright I was able to pull out a major DNA profile. And we use the term "match" only if we have a single source profile which is what a major DNA profile is. In the case of a mixture, which [Sierra] can't be excluded as a contributor to the mixture, we use that term "can't be excluded" instead of "match."

Q. All right. So can you tell me, let's assume that it is [Sierra's] DNA on the penile swab then, can you tell me if it was put there -- was it put there by vaginal fluid?

A. I can't say what it came from.

Q. You can't tell me if it was from her hand or from spit?

A. No. I can just say that it's DNA.

¶14 On redirect examination, the prosecutor followed up on defense counsel's use of the word "assume" in reference to the presence of Sierra's DNA:

Q. Okay. And then finally you were asked a question let's assume that it was [Sierra], her DNA that was on the Defendant's penis. Let's not assume that. Let's refer to what your testing results revealed. Was it her DNA?

A. She can't be excluded as a contributor.

Q. And that means?

A. That she can't be excluded as a contributor to the mixture on the penile swab.

Q. Because she matches at all those 16 points, right?

A. Yes, she does.

¶15 During closing arguments, the parties disputed the proper interpretation of Revis's testimony and report. Defense counsel argued that the language "cannot be excluded as a contributor is not the same as [Sierra] is the other contributor." The prosecutor objected on the ground that this comment "[m]ischaracterizes the testimony," but the court overruled the objection. Then, in her rebuttal, the prosecutor argued that Revis had used the term "cannot be excluded"—instead of "included"—only because this is the particular terminology used at the Forensic Science Division for mixed samples. She maintained that because Sierra's reference DNA profile matched the minor DNA profile

in the sample from Wright's penis at all 16 loci, Sierra's DNA must have been on his penis.

¶16 The jury found Wright guilty, and the District Court sentenced him to the Montana State Prison for 50 years. During its oral pronouncement of sentence, the court noted that Wright had since admitted that he raped Sierra. Wright's explanation was that "[s]he had been picking on me earlier, calling me a fucking idiot and a retard. I screwed up. . . . I was drunk and angry. My anger took over." During the sentencing hearing, Wright stated on the record that he was "sorry to [Sierra] for what I've done to her."

## DISCUSSION

### The Due Process Claim

¶17 To place Wright's argument in context, it is necessary at the outset to set out certain fundamental principles underlying DNA analysis.[1]

¶18 Virtually each one of the trillions of cells in the human body (except for red blood cells) has a nucleus containing DNA (deoxyribonucleic acid). Each cell of a particular individual has the same DNA configuration regardless of the cell's source (i.e., whether from hair, skin, blood, etc.). The significance of DNA for forensic purposes is that, with some exceptions not at issue here, no two individuals have identical DNA configurations.

---

[1] The ensuing explanation is derived from the discussions of DNA and DNA analysis in *People v. Soto*, 981 P.2d 958, 963-67 (Cal. 1999), *Young v. State*, 879 A.2d 44, 48-52 (Md. 2005), *State v. Moore*, 268 Mont. 20, 31-32, 885 P.2d 457, 464-65 (1994), *State v. Cauthron*, 846 P.2d 502, 508-09, 512-13 (Wash. 1993), and *United States v. Davis*, 602 F. Supp. 2d 658, 663-64, 673-74, 682-83 (D. Md. 2009). *See also* National Research Council, *The Evaluation of Forensic DNA Evidence* (1996) (available at http://www.nap.edu/catalog.php?record_id=5141), which is widely regarded as one of the definitive publications on the use of DNA evidence in the field of forensics (*see Davis*, 602 F. Supp. 2d at 663 n. 4; *see also e.g. Soto*, 981 P.2d at 976).

¶19     The DNA molecule consists of two strands, coiled in the form of a double helix, which looks like a twisted ladder. The sides of the ladder are made up of alternating units of phosphate and sugar. Running between the sugar-phosphate strands are billions of rungs, which are made up of four types of organic bases: adenine, guanine, cytosine, and thymine. Due to their chemical compositions, adenine will only bond with thymine, and cytosine will only bond with guanine. The sequence in which these base pairs (rungs) appear on the DNA ladder determines an individual's genetic traits. A specific sequence of base pairs that is responsible for a particular trait is called a gene. The position that a gene occupies along the DNA thread is known as its locus.

¶20     Genetically, humans are more alike than dissimilar. Over 99 percent of a human DNA molecule is the same from person to person, creating such shared features as arms and legs. But the remaining regions of human DNA molecules—more specifically, the sequences of base pairs in those regions—vary distinctly from one person to another, which results in individual traits. It is these variable regions, called "polymorphisms," that make it possible to establish identity and differences between individuals. Of the approximately three billion base pairs (ladder rungs) contained in one DNA molecule, only three million (0.1 percent) are thought to be polymorphic.

¶21     If one could analyze the entire length of a DNA strand and compare it to another complete DNA strand, an absolute identification could be provided. There is no practical way, however, to sequence all three billion base pairs in a person's DNA. Thus, forensic scientists seek to identify individuals through variations in their base-pair sequences at certain polymorphic DNA locations (loci). DNA patterns at polymorphic loci on the

evidentiary DNA molecule are compared to DNA patterns at corresponding loci on a reference DNA molecule. If the patterns do not match, then the contributor of the reference DNA can be conclusively excluded as the contributor of the evidentiary DNA. But where the patterns are sufficiently similar such that they could have originated from the same source, further analysis is required.[2]

¶22 The reason for this is that it is possible for unrelated individuals to have identical DNA patterns at a given locus. Hence, comparison of only one locus on the evidentiary DNA and the reference DNA would yield an extremely low confidence level that the two DNA samples came from the same person. The confidence level increases as the number of compared loci increases.[3] Still, because DNA profiles are composed of only a handful of loci out of the millions that constitute an individual's entire genetic make-up, these partial profiles are *not* assumed to be unique, especially among close relatives, and the possibility of coincidental matches and their probabilities must be taken into account.

¶23 "The question properly addressed by the DNA analysis is therefore this: Given that the suspect's [or, in the present case, the victim's] known sample has satisfied the 'match criteria,' what is the probability that a person chosen at random from the relevant population would likewise have a DNA profile matching that of the evidentiary sample?"

---

[2] *See e.g. Davis*, 602 F. Supp. 2d at 679 (" 'DNA typing is an exclusionary test. We try to exclude individuals from profiles. When we cannot exclude, we must then comment on what we do see in the profile.' " (quoting the affidavit of Meredith Kitey, Technical Leader for the U.S. Army Criminal Investigation Laboratory in Fort Gilem, Georgia)).

[3] It has been said that "[t]he discriminating power of DNA evidence is directly proportional to the number of loci where there are identical genotypes between two samples." *State v. Bander*, 208 P.3d 1242, ¶ 17 (Wash. App. Div. 1 2009).

*Soto*, 981 P.2d at 965. This probability is usually expressed as a fraction—i.e., the probability that one out of a stated number of persons in the population (e.g., 1 out of 100,000) would match the DNA profile of the evidentiary sample in question. *Id.* A greater probability—i.e., a fraction with a smaller denominator (e.g., 1 out of 10,000)—increases the probability that one or more other persons has a DNA profile matching the evidentiary sample. *Id.*

¶24 Accordingly, after profiling a specific number of loci on a strand of DNA, the analyst must obtain, from published tables, the frequencies of variations in genetic material at each tested locus. The frequencies of all the tested loci are then multiplied together (using the "product rule") to obtain the frequency with which that particular profile is seen in various population groups. Without reliable accompanying evidence as to the likelihood that other individuals in a given population could be a match (or could not be excluded as possible contributors), the jury has no way to evaluate the meaning of the result. *Commonwealth v. Mattei*, 920 N.E.2d 845, 855-56 (Mass. 2010); *but see Young*, 879 A.2d at 52-58 (concluding that if the probability of a random match is sufficiently minuscule (e.g., one in a trillion), then accompanying contextual statistics are not required and the expert may testify to "source attribution"—i.e., that it can be concluded, to a reasonable scientific certainty, the evidentiary sample and the reference sample came from the same person).

¶25 In the present case, Revis examined 16 loci on the DNA of the minor contributor to the penile swab. She compared those to the same 16 loci on Sierra's reference sample and found that the DNA fragments at all 16 loci "matched." This did not mean, however,

that it conclusively was Sierra's DNA on Wright's penis. Rather, this simply meant that the particular 16 loci matched. Sierra is not necessarily the only human being who has the particular base-pair configurations observed by Revis at each of these 16 loci, though there might be very few other unrelated people who have that same profile. *Cf. Young*, 879 A.2d at 51 ("[W]hen a DNA 'match' has been declared, a conclusive identification of a crime suspect as the source of the unknown DNA sample is not being made. Rather, the suspect simply has been 'included' as a possible source of the DNA material, because the suspect's DNA sample has matched the crime scene DNA sample at a certain number of critical alleles. The issue still remains of just how many other people in the population could share the same DNA profile with the suspect." (citations omitted)).

¶26    Thus, Revis had to ascertain the likelihood that the match between Sierra's DNA and the minor contributor's DNA was coincidental—i.e., the probability that a person chosen at random from the population would likewise have a DNA profile matching the minor contributor's DNA profile at the same loci.[4] To that end, Revis's DNA Report states that she consulted "national statistics" (specifically, B. Budowle et al., *Journal of*

---

[4] This is random match probability, which is not the same as source probability. "[I]f a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy." *McDaniel v. Brown*, ___ U.S. ___, 130 S. Ct. 665, 670 (2010) (per curiam); *see also State v. Jackson*, 2009 MT 427, ¶ 37, 354 Mont. 63, 221 P.3d 1213. "[T]he fallacy is in attempting to convert the expected frequency of occurrence into odds of occurrence. The danger in the fallacy is that the probability of finding a random match can be much higher than the probability of matching one individual, given the weight of the non-DNA evidence." *People v. Cua*, 119 Cal. Rptr. 3d 391, 404 (Cal. App. 1st Dist. 2011) (citation omitted).

*Forensic Sciences* 44(6): 1277 (1999)) and determined that "the estimated number of unrelated people in a random population expected to have a DNA profile that could be included in this mixed DNA profile" is 1 in 467,700 Caucasians, 1 in 2,351,000 Southwestern Hispanics, and 1 in 3,504,000 African-Americans. These probabilities represent two concepts: (1) the frequency with which the given DNA profile would be expected to appear in a population of unrelated people—in other words, how rare the DNA profile is (rarity statistic)—and (2) the probability of finding a match by randomly selecting one profile from a population of unrelated people (random match probability). *Cua*, 119 Cal. Rptr. 3d at 402. "It is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples." *People v. Wilson*, 136 P.3d 864, 869 (Cal. 2006).

¶27 The prosecutor, therefore, could have argued here that it was highly unlikely Sierra would have matched the minor DNA profile without actually being the contributor of that DNA. But it was not accurate to state that Revis's findings conclusively established that Sierra was the minor contributor. Likewise, the suggestion that Wright and Sierra were the only two persons in Montana who could have contributed the DNA to the penile sample was misleading. Probability of a random match does not equate with certainty of a particular source.

¶28 Wright contends that these errors in the presentation of the DNA evidence, and the prosecutor's corresponding closing arguments, amounted to a due process violation. Citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177 (1959), and *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc), he argues that a criminal defendant

is denied due process of law when a prosecutor either knowingly presents false evidence or fails to correct the record to reflect the true facts when unsolicited false evidence is introduced at trial. We note that in *Hayes*, the Ninth Circuit stated that *Napue* does not create a per se rule of reversal. 399 F.3d at 984. Rather, unless the error is structural,[5] the defendant must show that the testimony or evidence was actually false, that the prosecution knew or should have known that the testimony or evidence was actually false, and that the false testimony or evidence was material. *Id.*

¶29 Wright has failed to make this showing. First, the DNA evidence presented by the prosecutor was internally inconsistent (and perhaps somewhat confusing to the jury) on certain points, but it is doubtful that it falls into the category of being outright "false." As the State points out, Revis clarified several times that her finding was that Sierra "cannot be excluded" as a possible contributor to the mixed DNA profile. Second, while the prosecutor may have taken some license during direct examination and in her closing arguments, there is no evidence that she "knowingly" presented false testimony. In fact, by her own admission, the prosecutor was "confused" about how Revis's findings were to be interpreted. Third, defense counsel clarified with Revis during cross-examination what her precise findings were and pointed out that Sierra's DNA could have gotten on Wright's penis for reasons other than rape. Likewise, defense counsel asked the jurors during closing argument to look at Revis's report and emphasized that "cannot be excluded as a contributor is not the same as [Sierra] is the other contributor." Thus, the

---

[5] Wright does not contend, nor would we agree in any event, that the error here was structural. *See State v. Matt*, 2008 MT 444, ¶¶ 31-32, 43, 347 Mont. 530, 199 P.3d 244.

15

jurors were not left with an entirely uncontested interpretation of the DNA evidence. Finally, the prosecutor's assertions that Sierra's DNA actually was on Wright's penis would be more problematic if those assertions were based solely on Revis's report. As it is, however, the prosecutor relied on the non-DNA evidence (Sierra's testimony, her 911 call, the corroborating testimony of other witnesses, and the physical evidence) as well. That evidence was very strong, and it was fair to argue that Revis's findings, in conjunction with the non-DNA evidence, showed that it was Sierra's DNA. There does not appear, therefore, to be a reasonable likelihood that the allegedly false testimony could have affected the jury's judgment. *Hayes*, 399 F.3d at 984.

¶30 In sum, Wright has not demonstrated that his right to due process was violated.

**The Ineffective Assistance Claim**

¶31 A convicted defendant making a claim of ineffective assistance of counsel must show (1) that counsel's representation was deficient and (2) that the deficient performance prejudiced the defense. *State v. Norman*, 2010 MT 253, ¶ 19, 358 Mont. 252, 244 P.3d 737. Before we may reach the merits of an ineffective assistance claim on direct appeal, we must determine whether the claim is properly before us. *State v. Savage*, 2011 MT 23, ¶ 23, 359 Mont. 207, 248 P.3d 308. In general, the test to determine whether an ineffective assistance claim is properly brought on direct appeal is whether the record contains the answer to "why" counsel took, or failed to take, action in providing a defense. *State v. White*, 2001 MT 149, ¶ 20, 306 Mont. 58, 30 P.3d 340. If the record explains "why," then we will address the issue on direct appeal. *Savage*, ¶ 23. But if the claim is based on matters outside the record, then we will dismiss it without

prejudice and allow the defendant to raise the claim in a petition for postconviction relief. *See e.g. State v. Gunderson*, 2010 MT 166, ¶¶ 70-78, 357 Mont. 142, 237 P.3d 74.

¶32    Here, Wright asserts "that his trial attorney was ineffective in her challenge to the DNA evidence presented at trial" because she "did not properly cross-examine the State's expert, or offer expert testimony on Wright's behalf to counter that presented by the State." The record, however, does not reveal why trial counsel failed to undertake the actions Wright alleges she should have. Consequently, the claim cannot be resolved on direct appeal.

## CONCLUSION

¶33    We reject Wright's due process claim. We dismiss, without prejudice, his claim of ineffective assistance of counsel, and he may pursue that claim through a timely petition for postconviction relief.

¶34    Affirmed.

/S/ JAMES C. NELSON

We Concur:

/S/ MICHAEL E WHEAT
/S/ BRIAN MORRIS
/S/ PATRICIA COTTER
/S/ JIM RICE

17