No. 02-455

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 169

STEVEN KURT GRATZER,

      Petitioner and Appellant,

    v.

STATE OF MONTANA,

      Respondent and Respondent.


APPEAL FROM:    District Court of the Fourth Judicial District,
                      In and For the County of Missoula, Cause Nos. DV 2001-941 & DC 2000-341
                      Honorable John S. Henson, Presiding Judge


COUNSEL OF RECORD:

      For Appellant:

            Mark E. Jones, Attorney at Law, Missoula, Montana

      For Respondent:

            Honorable Mike McGrath, Attorney General; Ilka Becker,
            Assistant Attorney General, Helena, Montana

            Fred Van Valkenburg, County Attorney; Susan Boylan,
            Deputy County Attorney, Missoula, Montana


                              Submitted on Briefs:  June 19, 2003

                                      Decided:  June 19, 2003

Filed:

                                  Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      Steven Kurt Gratzer (Gratzer) appeals the District Court's denial of his petition for postconviction relief. We affirm.

¶2      The sole issue for consideration is: Whether the District Court erred in denying Gratzer's petition for postconviction relief.

Factual and Procedural Background

¶3      On the night of July 22, 2000, Missoula Police Officer Richard Eggett (Officer Eggett) witnessed a 1978 Chevrolet Caprice, in the oncoming lane of traffic, run a stop sign. As Officer Eggett made a U-turn, he observed the vehicle backing up into a motel parking space on the corner of Adams and Broadway. The officer then observed the driver get out of the vehicle and "fiddle" with the door. The driver then sat down in a lawn chair alongside of the City Center Motel. Officer Eggett testified that he had an unobstructed view of the vehicle as it pulled into the parking lot space and as the driver exited the vehicle. He also testified that there was only one person in the vehicle and that he had not seen anyone else in the area. Officer Eggett testified that he was certain that Gratzer was the driver of the vehicle and that, after his initial sighting of the Chevrolet Caprice, he maintained a full and unobstructed view of the suspect vehicle and its driver.

¶4      Officer Eggett then approached Gratzer who appeared intoxicated and was slurring his words. Gratzer denied knowing anything about the Caprice; however, following the officer's registration check of the vehicle, Gratzer admitted that the car belonged to his mother. The officer searched Gratzer following his arrest, but did not find any keys on his

2

person or in the vicinity. At the time of his arrest, Gratzer repeatedly stated that he had not been driving the vehicle. Gratzer was arrested and was charged with felony DUI. At trial, Gratzer's defense was that he had not been in actual physical control of, or driving, the vehicle. Officer Eggett was the sole witness to testify that Gratzer had been in actual control of the vehicle.

¶5    At trial, Mike Church (Church), an acquaintance of Gratzer, testified that he, not Gratzer, had actually been driving the car that night and that Gratzer had been a passenger. Church testified that he left the scene after parking the car at the motel. According to Gratzer, he was so intoxicated that he did not remember Church driving the vehicle. Also, at trial, Gratzer argued that he could not have been in actual physical control of the vehicle because he did not have an ignition key to it. During cross-examination of Officer Eggett, the following exchange occurred:

> Q:  Did you ever locate a key–an ignition key or any sort of key for the vehicle?
>
> A:  No.
>
> Q:  Okay.  Did you ever enter into the vehicle?
>
> A:  Yes, I did.
>
> Q:  And how did you do that?
>
> A: When the tow truck arrived, I had the tow truck driver unlock the door for me so that I could get in the glove box and get the registration out to fill out some paperwork.

Q: Did you ever make any physical search for the key, an ignition key, or any set of keys or anything of that nature even after you couldn't find the keys on Mr. Gratzer?

A: In the vehicle you mean?

Q:  In the vehicle or around in the surrounding area.

A:  I did not search in the vehicle. I did search the surrounding area where Mr. Gratzer was sitting in a lawn chair. This was right next to some stairs, which had some empty space underneath them which was used for storage. And I did look in through there and around the lawn chair and could not locate any keys.

Q:  But as you testified before, you did not see him toss anything or get rid of anything, at any rate?

A:  Correct.

Q:  If he didn't have the keys on his person, then, in fact he did not have the ability to control that vehicle or to drive that vehicle, isn't that correct?

A:  I wouldn't know.

Q:  Don't you need to have a key in order to operate that vehicle?

A:  I've owned a Chevy Caprice that did not require a key. And I've owned one other car that did not require a key. . . .

¶6     A jury convicted Gratzer of felony DUI.  Gratzer was sentenced to thirteen months in prison followed by four years of supervised probation.  Gratzer filed an appeal with this Court; however, we dismissed his appeal, at his request, and Gratzer instead filed a petition for postconviction relief with the District Court.  In his petition, Gratzer alleged that Officer Eggett fabricated testimony in order to secure Gratzer's conviction, thereby violating his right to due process of law.  The District Court held a hearing on the matter.  At the hearing,

4

Officer Eggett acknowledged that he had not actually owned a Chevrolet Caprice, but rather he had been issued a 1993 or 1994 model by the Sheriff's Department and came to think of it as his. He also testified that "after having [the Chevy Caprice] for a couple of years, the ignition wore out to the point that the key could come out of the ignition and you could turn the car on and off without the key." He never reported this to his supervisor because he did not consider it a problem. Officer Eggett reiterated that he had seen numerous vehicles that operate without keys.

¶7 Officer Willis Hintz also testified at the postconviction relief hearing. Officer Hintz had been a patrol street supervisor for 11 years and was familiar with Chevy Caprices owned by the Sheriff's Department, like the one issued to Officer Eggett. Officer Hintz testified that he was familiar with the Caprices that started without a key. He explained that with the 1993 and 1994 models one could "put the key in, turn it just one notch, pull out the key, and [] actually start the car without the key." He also stated that he had been present for Officer Eggett's testimony and that he had not been surprised to hear Officer Eggett's testimony that he could operate his car without a key.

¶8 On cross examination, the following exchange between Gratzer's counsel and Officer Hintz occurred:

> Q: So what you're saying is –I want to make sure I'm clear–you can take these Chevrolet Caprices and turn them one notch, and then take the key out and you could run them without a key?
>
> A: Yes.

5

Q: But what you're telling the Court is you really couldn't run–you have to have the key to turn it that notch?

A: That depends on how you shut it off. Okay. There's–there's four different positions on the ignition. Okay? You've got the position where the steering wheel is locked and the car is off. Correct? We agree on that? The next position you can turn it and it will click and the car will be off, won't run, nothing's on. The next position is where the car–you have the car on; and if you turn it just a little bit further, where the spring is, it actually starts. The key comes back into that position and the car runs. So it depends on where you turn the key off. Now, that particular episode, on whether the car will start or not–

Q: Well, let's just assume that the car has been properly turned off, like any human being would probably turn the car off and put it in a locked position and pull the key, would you make that assumption?

A: If you want to make that assumption.

Q: Okay. What you're testifying to is then under those circumstances, that car is not going anywhere unless you put a key in the ignition and click it once, correct?

A: Correct.

¶9 Following the hearing, the District Court denied Gratzer's petition. In response, Gratzer filed this timely appeal.

### Standard of Review

¶10 We review the denial of a petition for postconviction relief to determine whether the trial court's findings of fact are clearly erroneous and whether its conclusions of law are correct. *State v. Graham*, 2002 MT 237, ¶ 10, 311 Mont. 500, ¶ 10, 57 P.3d 54, ¶ 10; *Mallak v. State,* 2002 MT 35, ¶ 12, 308 Mont. 314, ¶ 12, 42 P.3d 794, ¶ 12.

### Discussion

6

¶11 Gratzer argues that Eggett's "perjured testimony," regarding his ownership of a vehicle similar to the one driven by Gratzer and his contention that it could be operated without an ignition key, violated his right to due process. According to Gratzer, a law officer's knowingly false testimony is sufficient to deny a defendant of due process of law as guaranteed by the Fourteenth Amendment. *Curran v. State of Delaware* (3rd Cir. 1958), 259 F.2d 707, 713. Gratzer correctly cites our decision in *Gollehon v. State*, 1999 MT 210, 296 Mont. 6, 986 P.2d 395, as setting forth the criteria for determining whether rights under the Fourteenth Amendment have been violated. To prevail on this claim, Gratzer must establish that: (1) Officer Eggett's testimony was actually false; (2) the <u>testimony was material to the verdict</u>; and (3) the prosecutor knew or believed the testimony to be false. *Gollehon*, ¶ 33; *see Fuller v. Johnson* (5th Cir.1997), 114 F.3d 491, 496, *cert. denied,* 522 U.S. 963, 118 S.Ct. 399, 139 L.Ed.2d 312 (1997). False evidence is "material" only if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *See Westley v. Johnson* (5th Cir. 1996)*,* 83 F.3d 714, 726, *cert. denied,* 519 U.S. 1094, 117 S.Ct. 773, 136 L.Ed.2d 718 (1997).

¶12 Gratzer argues that Eggett's testimony was material to his conviction because it supported one of the elements of the crime with which he was charged. Section 61-8-401, MCA, provides that "[i]t is unlawful and punishable . . . for a person who is under the influence of: (a) alcohol to drive or be in <u>actual physical control</u> of a vehicle upon the ways of this state open to the public. . . ." (Emphasis added.) Gratzer maintains that the issue of whether Gratzer could have operated the vehicle without a key was pivotal to a jury's

7

determination that he was in actual physical control of the vehicle. Because no ignition keys were found on Gratzer or in the vicinity, Gratzer argues that Eggett's testimony was the State's only evidence that he had actually been in physical control of the vehicle. Gratzer also contends that it is impossible to know how much weight the jury attached to this testimony. He submits that, had the jury realized the "misleading" nature of the officer's testimony, the jury might very well have applied the maxim "*falsus in uno, falsus in omnibus*," and disregarded the remainder of Officer Eggett's testimony.

¶13    Gratzer characterizes Officer Eggett's testimony as "perjured." The dissent falls prey to this hyperbole when it engages in a strawman analysis of "false testimony" that Gratzer's vehicle could be operated without a key. Although Officer Eggett may have been misleading when he said he "owned" a Chevy Caprice which could be started without a key, when, in fact, the car was a county-owned car issued to him, ownership of the car is entirely irrelevant to the issue of whether the car would start without a key. There is nothing in the record which would suggest that Eggett's testimony about Chevy Caprices starting without keys was "false" or "perjured." To the contrary, his testimony was corroborated by Officer Hintz. Officer Hintz's testimony at the post-trial hearing explained that, indeed, some Caprices can be started without a key when the ignition is left in a certain position. In this case, it is unknown in which position the ignition was when Gratzer started his 1978 Caprice on July 22, 2000. Although neither the State nor the defense presented testimony as to whether Gratzer's car, in particular, could be started without a key, this does not alter the fact that apparently some Caprices can be started without keys in certain circumstances. We agree

8

with the District Court and its assessment that, although Officer Eggett's testimony that he personally "owned" a Chevy Caprice may have been misleading, it was not material to the verdict. In its denial of Gratzer's petition for postconviction relief, the District Court reasoned:

> It cannot be known what weight the jurors gave Eggett's statement that he had "owned a Chevy Caprice that did not require a key." However, the issue of physical control of the vehicle by Petitioner was also evidenced by Eggett's earlier testimony that he saw Petitioner drive and park the car, a point Petitioner omits in his petition.

The District Court went on to conclude that "Deputy Eggett's testimony that he saw [Gratzer] driving and exiting the car, viewed alone, was sufficient for the trier of fact to determine that [Gratzer] was driving or in actual physical control of the car." We agree with the District Court. In light of Officer Eggett's testimony that he witnessed Gratzer both driving and exiting the vehicle, we conclude that Eggett's statements regarding his personal ownership of a Chevy Caprice were not material to the jury's verdict and that Gratzer's due process rights were not violated. Accordingly, we affirm the District Court's denial of Gratzer's petition for postconviction relief.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ JIM REGNIER

9

Justice Jim Rice dissenting.

¶14     I agree entirely with Gratzer's arguments, summarized in ¶ 12 of the Court's opinion, and for those and the additional reasons set forth herein, I would reverse and remand for a new trial.

¶15     The Court notes that we adopted a three-part test in *Gollehon* to determine the effect of knowingly false testimony on a defendant's due process rights.  We did so in *Gollehon* without explanation, but by simple citation to the source of the test, *Fuller v. Johnson* (5th Cir. 1997), 114 F.3d 491.

¶16     *Fuller*'s formulation of the test was premised upon the principles enunciated by the United States Supreme Court in *Giglio v. United States* (1972), 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104.  *Fuller*, 114 F.3d at 496.  In *Giglio*, the prosecution promised a witness in a criminal forgery case that if he testified, he would not be prosecuted.  During the trial, defense counsel asked the witness on cross-examination if any promises of leniency had been made, and the witness falsely answered no, which the prosecution did not correct.  The Court discussed how false testimony would be treated:

> [T]his Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." . . . When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within [the] general rule [requiring a new trial]. *Napue*, *supra*, at 269.  We do not, however, automatically require a new trial whenever "a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict . . . ." *United States v. Keogh*, 391 F.2d 138, 148 (CA2 1968).  A finding of materiality of the evidence is required under *Brady* [*v. Maryland*], *supra*, at 87.  A new trial

10

is required if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . ." *Napue*, *supra*, at 271.

*Giglio*, 405 U.S. at 153-54, 92 S.Ct. at 766, 31 L.Ed.2d at 108. The Court concluded that the false testimony was material and reversed and remanded for a new trial. *Giglio*, 405 U.S. at 155, 92 S.Ct. at 766, 31 L.Ed.2d at 109.

¶17 Here, the arresting officer offered false testimony during cross-examination to the effect that he had owned a car like Gratzer's which could be operated without a key:

> Q: But as you testified before, you did not see him toss anything or get rid of anything, at any rate?
>
> A: Correct.
>
> Q: If he didn't have the keys on his person, then, in fact, he did not have the ability to control that vehicle or to drive that vehicle; isn't that correct?
>
> A: I wouldn't know.
>
> Q: Don't you need to have a key in order to operate that vehicle?
>
> A: I've owned a Chevy Caprice that did not require a key. And I've owned one other car that did not require a key, so–

The clear implication of the officer's testimony was that Gratzer's vehicle, being a Chevy Caprice, could also be operated without a key. However, the officer's testimony was not accurate.

¶18 The Court attempts to minimize the officer's inaccurate testimony by asserting that the officer's ownership of the Caprice, though admittedly falsely stated, was irrelevant and immaterial to the conviction, and that there is "nothing in the record" which would suggest that the officer's testimony about a Chevy Caprice starting without a key was false. While

11

I agree that the false testimony regarding the officer's ownership is irrelevant and immaterial to the conviction, I disagree that there is nothing in the record suggesting the officer's testimony was false regarding operation without a key. To the contrary, the testimony at the postconviction hearing by Officer Hintz, the patrol supervisor, clearly demonstrated that a key *was* initially required in order to operate the Caprice referenced by the officer in his trial testimony, directly contradicting the officer's trial statement that "I've owned a Chevy Caprice that did not require a key." Under cross-examination, Hintz testified:

> Q: Well, let's just assume that the car has been properly turned off, like any human being would probably turn the car off and put it in a locked position and pull the key, would you make that assumption?
>
> A: If you want to make that assumption.
>
> Q: Okay. What you're testifying to is then under those circumstances, that car is not going anywhere unless you put a key in the ignition and click it once, correct?
>
> A: Correct.

Thus, the officer's trial testimony that he had operated a Caprice "that did not require a key" was inaccurate and distinctly misleading.

¶19 This false testimony went directly to the issue of Gratzer's actual physical control of the vehicle, an element of the crime. The officer was unable to locate the vehicle's key on Gratzer or elsewhere at the scene, but the false testimony eliminated the significance of this evidence, and thus, tended to undermine Gratzer's defense that he had not controlled the vehicle. The testimony also tended to undermine Church's testimony that he (Church) had driven the vehicle, and then departed from the scene. Church testified that he parked the

12

vehicle and departed in a hurried manner to distance himself from Gratzer, who was becoming irritable. He further testified that, although he had no recollection of what he did with the key when he departed, "I have a habit of taking keys accidentally. . . I take the key with me . . . . Its just a habit I have." Thus, the officer's inability to locate a key was arguably consistent with Church's version of the events, but the false testimony undermined Gratzer's opportunity to take advantage of the evidence and make such an argument. If a key was not needed to operate the vehicle, then the whereabouts of the key became a useless consideration.

¶20    Further, in an apparent effort to counter the defense, the State incorporated Church's testimony into its theory. In closing argument, the prosecutor argued that Church had, in fact, driven the vehicle, parked it, and departed on foot, but that Gratzer had proceeded to drive the vehicle thereafter. If the jury had chosen to believe that Church had taken the key, the State's theory would have been nullified–except for the false testimony that the vehicle could be operated without a key. The falsehood thus deprived the defense from the opportunity to counter the State's theory, and the jury of an opportunity to consider it.

¶21    The Court dismisses these effects on the trial by concluding that the false testimony was not material because the same officer who testified falsely also provided testimony of other observations he had made of Gratzer's control of the vehicle. I disagree.

¶22    The effects of the false testimony on this trial were not eliminated by the officer's additional observations. In *Napue v. Illinois* (1959), 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217, the United States Supreme Court considered the effect of false testimony where,

similar to the facts in *Giglio*, which relied upon *Napue*, a witness falsely testified that he had received no promises in exchange for his testimony. However, the jury was informed through other testimony that the witness's public defender "was going to do what he could" to aid the witness and "was trying to get something" for him. *Napue*, 360 U.S. at 268, 79 S.Ct. at 1176, 3 L.Ed.2d at 1220. However, this additional evidence did not alleviate the Court's concern over the witness's false testimony:

> [W]e do not believe that the fact that the jury was apprised of other grounds for believing that the witness . . . may have had an interest in testifying against petitioner turned what was otherwise a tainted trial into a fair one. . . . Had the jury been apprised of the true facts, however, it might well have concluded that [the witness] had fabricated testimony in order to curry . . . favor . . . .

*Napue*, 360 U.S. at 270, 79 S.Ct. at 1177, 3 L.Ed.2d at 1221.

¶23    Likewise, the officer's other testimony that Gratzer had exerted control over the vehicle did not remove the taint of his false testimony from the trial. As in *Napue*, it is entirely possible that the jury here, but for the false testimony, may have concluded the absence of a key meant that Church had walked away with it, and that Gratzer had not exerted control over the vehicle.

¶24    A new trial is required if false testimony could "in *any reasonable likelihood* have affected the judgment of the jury." *Giglio*, 405 U.S. at 154, 92 S.Ct. at 766, 31 L.Ed.2d at 108 (emphasis added). Further, the prosecutor's lack of involvement in procuring the false testimony does not remove the taint, as a new trial is required "irrespective of the good faith or bad faith of the prosecution." *Giglio*, 405 U.S. at 153, 92 S.Ct. at 766, 31 L.Ed.2d at 108. I would conclude that because Gratzer was deprived of legitimate factual and legal arguments

regarding control of the vehicle, an element of this crime, the false testimony was material to the verdict and reasonably likely to have affected the jury's judgment.

¶25 Further, the officer was the State's only witness who identified Gratzer as being in control of the vehicle. His reliability and credibility were critical to Gratzer's conviction. Due process requires us to ensure that the entirety of his testimony was the truth.

¶26 I would reverse and remand for a new trial, and I dissent from the Court's decision.


/S/ JIM RICE

Justice Patricia O. Cotter and Justice John Warner join in the dissenting opinion of Justice Rice.


/S/ PATRICIA COTTER
/S/ JOHN WARNER