FILED

03/10/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0663

DA 24-0663

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 46

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

JUSTIN CASEY STINGER,

       Defendant and Appellant.

APPEAL FROM:   District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC-22-406
Honorable Robert L. Deschamps III, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          Larry D. Mansch, Tobias J. Cook, Snyder, Beaudry & Cook P.C., Missoula, Montana

     For Appellee:

          Austin Knudsen, Montana Attorney General, Mardell Ployhar, Assistant Attorney General, Helena, Montana

          Matthew Jennings, Missoula County Attorney, Ryan Mickelson, Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  December 17, 2025

Decided:  March 10, 2026

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1    Justin Stinger appeals from his Fourth Judicial District Court jury conviction of Partner or Family Member Assault (PFMA) by Reasonable Apprehension (3rd or Subsequent Offense), Destruction/Tampering of a Communication Device, Aggravated Assault by Reasonable Apprehension, Strangulation of Partner or Family Member (1st Offense), and PFMA Causing Bodily Injury (3rd or Subsequent Offense).  Stinger asserts he was denied due process from the outset of his case, and his conviction was the result of cumulative error.  Specifically, Stinger argues that law enforcement officers filed false reports and breached protocol, he experienced judicial bias at his initial sentencing hearing, the District Court lacked control over the proceedings at trial, and the State knowingly presented false or misleading testimony which it then failed to correct.  We restate the issues on appeal as follows:

1.   *Whether Stinger's unpreserved claims warrant plain error review.*

2.   *Whether the cumulative effect of errors warrants a new trial.*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶2    This case arises from two separate incidents involving Stinger and his then wife, Kasondra.  Stinger and Kasondra married in 2008 and had two children together, Kiley and Jaxson.  The couple co-owned a roofing company, as well as a dog breeding business, the kennel for which was located at the family's home in Huson, Missoula County, Montana.  Prior to the events giving rise to this case, the relationship between Stinger and Kasondra

2

had been marked by periodic episodes of aggression and intimidation, contributing to ongoing tensions within their household.

¶3 The first incident giving rise to this case arose on June 20, 2022. Kasondra, Stinger, and the children had spent the day in Missoula with Kasondra's parents as part of a joint Father's Day celebration and had returned home for a casual evening. Kasondra and Stinger opened a bottle of wine and were in the living room with Jaxson (age 8), when Kiley (age 10) came in trying to find a piece of orthodontic equipment. Stinger quickly became upset and asked Kasondra if she was "too effing stupid to help [Kiley] keep track of it." Jaxson interjected, reminding his dad that Kiley had actually given the expander to him (Stinger) to keep track of. Stinger approached Jaxson and yelled at him to "shut the fuck up," causing Jaxson to cry. Kasondra, concerned for Jaxson's safety, put herself between Jaxson and Stinger to keep Stinger from being able to physically get to Jaxson. According to Kasondra, she was "holding" Stinger off of Jaxson when Stinger "shove[d] [her] almost to the ground" and then ran to Kiley's room, where he forced open the door and found Kiley on the phone with 911.

¶4 During the 911 call, Kiley informed the operator that her dad was yelling, drunk, and raising his voice at her brother. The operator asked Kiley if her dad had any weapons, to which Kiley responded, "just his hands." Kiley explained she thought her dad might hurt someone and told the operator she had locked herself in her room. Kiley then began yelling into the phone, "He's coming! He's coming!" before the call was ended.

3

¶5 The 911 operator called Kiley's cell phone back and Kasondra picked up, explaining her daughter had been the one to call. The operator asked Kasondra, "Are you free to speak freely?" to which Kasondra responded, "No." When asked, "Has he laid hands on you?" Kasondra responded, "Kind of." Kasondra then explained to the operator that she was trying to get her car keys and was going to get the kids in the car and leave the property.

¶6 Deputy Jackson Sedgwick and Deputy Nicholas Janttie of the Missoula County Sheriff's Office met Kasondra on a road a few miles from her home. The deputies' conversations with Kasondra, Jaxson, and Kiley were captured by Sedgwick's dashcam and Janttie's bodycam. Footage shows Sedgwick initially approached the driver's side of Kasondra's vehicle, introduced himself, and asked, "What's going on tonight?" Kasondra stated that her "husband just freaked out" and "started screaming" and "like attacked us all." Sedgwick asked what she meant by "attacked us all," and Kasondra explained Stinger screamed at Jaxson, pushed her out of the way, and pushed down Kiley's door to scream at her. Sedgwick then had Kasondra step out of the car to talk and she provided him and Janttie with the details of how the fight began and Stinger's history of being abusive towards her. Kasondra was crying throughout much of the conversation and became increasingly hysterical as she explained she had placed herself between Stinger and Jaxson as Stinger was trying to "get at" Jaxson. Sedgwick told Kasondra to take some breathers and asked, "How was [Stinger] running at [Jaxson]?" Kasondra responded by explaining she was not sure what Stinger was going to do to Jaxson, just that he "kept trying to get at him" and that she had to "push him back" because she "wasn't sure what he was going to

4

do"; she "just wanted to make sure he did not touch [Jaxson]," but Stinger "just kept pushing" and she kept "getting in front of him" to make sure "he did not get to [Jaxson]."

¶7 Sedgwick then asked Jaxson to step out of the vehicle and the two of them talked as Janttie continued to interview Kasondra. During Sedgwick's interview of Jaxson, Jaxson was not crying but was visibly anxious, playing with his hands and sucking his thumb. Jaxson explained to Sedgwick that his dad started "yelling and cussing" at everyone and "pushing [his] mom." Jaxson stated he had been scared because he "didn't want anything bad to happen," "like [his] dad hurting [his] mom, or like him hurting [Jaxson]." Jaxson said he thought Stinger may "push [him] or like scream at [him]" and explained, "in the past, this happened before" and that Stinger used a shovel to smash a windshield of one of their cars.

¶8 After talking with Jaxson, Sedgwick interviewed Kiley. While Kiley's back was turned to the dash cam, her voice was shaky and at several points she could be heard audibly crying and sniffling. She explained to Sedgwick that she ran to her room and called 911 when her dad started yelling but that he then pushed through her door. Kiley said after her dad grabbed her phone and hung up with the police, he "kept like stepping closer" to her, making her "really uncomfortable," and yelling at her, asking "[w]hy did you effing call the police?" Kiley said at one point Stinger "like ran towards [her]." She explained she felt "like oh my god, this is happening again," and told Sedgwick about an incident "one or two months before" where Stinger was angry and would not let her, Kasondra, or Jaxson leave the house.

5

¶9      As Kasondra was interviewed by Janttie, Janttie asked if anything physical happened and Kasondra explained that Stinger kept trying to push by her to get to Jaxson. Janttie also asked if there had been any drinking and Kasondra explained that since 6:00 p.m., she and Stinger had drank two bottles of wine and opened a third but clarified she had not had any of the third.

¶10     After interviewing Kasondra and the kids, Sedgwick and Janttie went to the family home to talk with Stinger. The deputies announced themselves and knocked on the front door. Despite Stinger's vehicle being in the driveway, he did not answer, and after having knocked for about twenty minutes, the deputies departed.

¶11     On July 25, 2022, the State charged Stinger with one count of felony PFMA and one count of misdemeanor criminal destruction of or tampering with a communication device. The District Court ordered as a condition of Stinger's release that "[he] shall have no contact with [Kasondra Stinger] aside from contact for business purposes and child exchange purposes."

¶12     The second incident giving rise to this case occurred on the evening of October 27, 2022. Kasondra and the children were at the family home getting decorations together for an upcoming Halloween party. Stinger and Kasondra were separated at the time and he no longer lived with the family, but he agreed to pick up dog food and drop it off after work, pursuant to the terms of his pretrial release. Kasondra expected Stinger to drop off the food between 4:45 p.m. and 6:00 p.m., and when Stinger was yet to show up at 6:00 p.m.,

Kasondra communicated to him that it was too late and he should not come. Stinger, however, showed up around 7:00 p.m.

¶13 When Stinger arrived, Kasondra went outside to meet him and unload the dog food. However, a physical altercation immediately ensued, ending with Kasondra escaping Stinger's grasp by crawling underneath his truck. Once Stinger calmed down, Kasondra came out from under the truck and Stinger followed her inside the house where he demanded that she give him her phone. Kiley, concerned for her mother's safety, asked Kasondra to come to the master bathroom with her, explaining she needed help with something. Stinger proceeded to follow Kasondra and Kiley into the master bedroom when Kasondra pulled an unloaded gun out from under the mattress and told Stinger to leave the property immediately. Stinger complied. Kasondra then called 911 and arranged to meet Deputy Wagner near the interstate.

¶14 Kasondra's interaction with Wagner was recorded via Wagner's body cam, as was most of her evaluation with the responding paramedics. Kasondra told Wagner she had an "order of protection" against Stinger, but that he had been dropping off dog food pursuant to the terms of the court's order. Kasondra explained an altercation ensued when she dumped some of Stinger's laundry on the ground while unloading dog food from his car and that Stinger then grabbed her, put her in a head lock and started choking and punching her while also trying to cover her nose and mouth with his hand. Kasondra stated Stinger punched her in the head at least twice before she was able to wrestle herself free and under the truck. Kasondra said she had been unable to breathe for a period of about 10 to

7

15 seconds, plus another 5 seconds when Stinger covered her mouth and nose. Kasondra also told Wagner that Stinger had been grabbing at her and trying to pull her out from under the truck. Kasondra's pants were covered in dirt and mud and visibly ripped at a seam near the front pocket. Dirt was also visible over much of Kasondra's body and in her hair. Kasondra also had visible scratches on her arms and knees, and a portion of her neck was red.

¶15 Wagner's body camera captured much of Kasondra's evaluation with Joe Winiarski, the responding paramedic, who was also accompanied by an EMT. Winiarski asked Kasondra during his evaluation if she had seen any spots. Kasondra responded she had not but stated, "this eye is really screwed up from when he hit me" and explained that her contact lens had been knocked out. Kasondra also stated that she was having some difficulty breathing in, but she was not sure if that was attributed to the chokehold or her being emotionally worked up. While Winiarski encouraged Kasondra to go to the hospital for additional treatment, Kasondra declined to do so.

¶16 Body camera footage also showed Stinger's truck approaching the scene, traveling in the direction back towards the family home, then quickly turning at an intersection upon seeing law enforcement talking with Kasondra. Deputy Rush pursued Stinger and ultimately stopped him down the road. While Stinger admitted there had been an altercation between him and Kasondra, he told Rush he had only placed Kasondra in a "bear hug" to protect himself after she punched him in the ear. Stinger repeatedly complained to Rush that his ear was swollen as a result of Kasondra's initial punch. At the

8

detention center following his arrest, Rush acknowledged Stinger's ear "could be" swollen and took several pictures of it.

¶17 On October 28, 2022, the State filed an Amended Information charging Stinger with the additional offenses of aggravated assault, strangulation of a partner or family member, felony PFMA, and misdemeanor criminal destruction of or tampering with a communication device. A trial was scheduled for May 10, 2023.

¶18 On April 27, 2023, Stinger moved the District Court to vacate the jury trial and schedule a change of plea hearing, specifically requesting that the hearing be in July. The District Court scheduled the hearing for July 11, 2023, but after being pushed back two more times at Stinger's request, the hearing was ultimately conducted on August 15, 2023.

¶19 On August 15, 2023, Stinger and the State entered a plea agreement pursuant to § 46-12-211(1)(b), MCA, in which Stinger agreed to plead guilty to two counts of felony PFMA and two counts of misdemeanor destruction of or tampering with a communication device. The State agreed to dismiss the charges of aggravated assault and strangulation, and to recommend a five-year sentence to the Department of Corrections, with two years suspended for each of the felonies, and a six-month suspended sentence for the two misdemeanors. The District Court accepted Stinger's no contest pleas, ordered a presentence investigation report (PSI), and scheduled a sentencing hearing for October 30, 2023.

¶20 On October 27, 2023, Stinger filed an opposed motion to continue the scheduled sentencing hearing, arguing that he needed six weeks to complete several pending jobs

related to his roofing business. The parties appeared for the sentencing hearing as scheduled, but after Stinger presented his argument for postponement, the District Court informed the parties it would grant Stinger's motion for a continuance, but after reviewing the PSI, it would be rejecting the plea agreement. Specifically, the District Court explained:

> After reviewing the presentence report, I'm gonna reject [the plea agreement], and I think he should get ten with seven suspended. So I want to go higher, mostly because . . . this is his third and fourth partner family member assault conviction. This is his . . . fifth and sixth felonies, including prior crimes, three counts of robbery and witness tampering. He—even though, unbelievably, he scored as a low risk on the risk assessment, he ought to take that and burn it because it's ridiculous with that kind of a felony record.

> But in any case, you know, he blames his wife. He minimizes his own behavior. He—they—it was based on his answers to the risk assessment that they came up with the low risk because he said, Oh, I don't have any family problems. I don't have any substance abuse, or, My mother loves me. I'm a hard working guy. And my note is he's just a mean, violent SOB. But no substance abuse, claims family support, his mother loves him, has a job, self-employed roofer. You know, I think this guy's dangerous. And so I'll give you your continuance.

> Bring your toothbrush because I'm gonna send you away, and I'm gonna put you on probation for ten years unless you want to withdraw your plea. So if—I'll give you a chance to think about that.

¶21 At the rescheduled sentencing hearing on December 11, 2023, Stinger advised the court that he wished to withdraw his pleas and proceed with a jury trial. A three-day jury trial then commenced on June 12, 2024, in which the jury found Stinger guilty of PFMA – Reasonable Apprehension, PFMA – Bodily Injury, Strangulation of a Partner or

Family Member, Aggravated Assault, and one count of Criminal Destruction or Tampering with a Communication Device.

## STANDARD OF REVIEW

¶22 This Court generally does not review issues raised for the first time on appeal. *State v. Burrington*, 2025 MT 238, ¶ 17, 424 Mont. 356, 578 P.3d 122. "When reviewing unpreserved claims of error, we employ the plain error doctrine sparingly, on a case-by-case basis, considering the totality of circumstances of each case." *Burrington*, ¶ 17 (quoting *State v. George*, 2020 MT 56, ¶ 5, 399 Mont. 173, 459 P.3d 854).

¶23 Evidentiary rulings are generally reviewed for abuse of discretion. *State v. Lotter*, 2013 MT 336, ¶ 13, 372 Mont. 445, 313 P.3d 148. However, "[r]ulings regarding the admissibility of evidence are left to the sound discretion of the trial court and will not be overturned absent a showing of manifest abuse of discretion." *State v. Wilmer*, 2011 MT 78, ¶ 11, 360 Mont. 101, 252 P.3d 178.

## DISCUSSION

¶24 *1. Whether Stinger's unpreserved claims warrant plain error review.*

¶25 In his principal brief, Stinger asserts various procedural, trial, and constitutional errors premised on allegations of police misconduct, judicial bias, the District Court's lack of control over courtroom proceedings, and the State's failure to correct testimony that it knew to be false or misleading, in violation of *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173 (1959). Stinger did not raise any of these claims of error prior to appeal. As such, in response, the State argues Stinger's claims of error are unpreserved and we should decline

11

to exercise plain error review due to Stinger's failure to raise the issue of plain error in his opening brief. The State further argues that even if we overlook the shortcomings of Stinger's opening brief, Stinger nonetheless fails to convincingly establish plain error review as warranted for any of his assertions.

¶26 In his reply brief, Stinger does not address whether his claims were adequately preserved and thus appears to concede the issue of preservation. Rather, as predicted by the State, Stinger asserts—for the first time—in his reply brief that plain error review is warranted. Stinger's plain error analysis, however, is largely premised on claims of error he did not raise in his opening brief.[1] Stinger also fails to address the State's argument— and this Court's precedent—providing that plain error review must be requested in an appellant's opening brief—not an appellant's reply brief.

¶27 To invoke plain error review, we have held that an assertion of plain error must be raised and argued on appeal. *In re B.H.*, 2018 MT 282, ¶ 15, 393 Mont. 352, 430 P.3d 1006. We have also long recognized that "[i]t is improper for us to consider an issue that is raised for the first time in a reply brief." *State v. Johnson*, 2010 MT 288, ¶ 13, 359 Mont. 15, 245 P.3d 1113 (citation omitted); *State v. Ferguson*, 2005 MT 343, ¶ 39, 330 Mont. 103, 126 P.3d 463; *State v. Raugust*, 2000 MT 146, ¶ 19, 300 Mont. 54, 3 P.3d 115; *State v. Hagen*, 283 Mont. 156, 159, 939 P.2d 994, 996 (1997); *see* M. R. App. P. 12(3).

---

[1] In his reply brief, Stinger asserts for the first time that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), by withholding a report from Rocky Mountain Eye regarding Kasondra's treatment until one day before trial, as well as a report from Frenchtown Fire Department regarding Kasondra's on scene evaluation. We decline to address these claims as they are raised for the first time in reply briefing.

Accordingly, we have consistently refused to invoke the common law doctrine of plain error review when it is raised for the first time in a reply brief. *Johnson*, ¶ 13; *Raugust*, ¶ 19; *Hagen*, 283 Mont. at 159, 939 P.2d at 996. Plain error review is, however, entirely discretionary. *State v. Strizich*, 2021 MT 306, ¶ 28, 406 Mont. 391, 499 P.3d 575. Thus, we consider the issues raised by Stinger "with the apposite circumspection to determine whether [he] has made the case for our discretionary review." *See Strizich*, ¶ 33.

¶28 We will only invoke the plain error doctrine to correct an unpreserved error if the error "affects the fairness, integrity, and public reputation of judicial proceedings." *Burrington*, ¶ 30 (quoting *State v. Akers*, 2017 MT 311, ¶ 10, 389 Mont. 531, 408 P.3d 142). The doctrine is employed sparingly. *George*, ¶ 5. "Simply asking this Court to review an unpreserved issue under the plain error doctrine is not enough" to invoke review. *Burrington*, ¶ 17 (citation omitted). Rather, for plain error review to be warranted, a defendant must "(1) show that the claimed error implicates a fundamental right," and "(2) 'firmly convince' this Court that failure to review the claimed error would result in a manifest miscarriage of justice, leave unsettled the question of fundamental fairness of the trial or proceedings, or compromise the integrity of the judicial process." *State v. Norman*, 2010 MT 253, ¶ 17, 358 Mont. 252, 244 P.3d 737 (quoting *State v. Taylor*, 2010 MT 94, ¶ 17, 356 Mont. 167, 231 P.3d 79).

¶29 Therefore, under the plain error doctrine, with regard to each error asserted, Stinger must establish: "(1) a plain or obvious error; (2) that affected a constitutional or other

13

substantial right; and (3) which prejudicially affected the fundamental fairness or integrity of the proceeding." *State v. Abel*, 2021 MT 293, ¶ 4, 406 Mont. 250, 498 P.3d 199.

**Police Misconduct**

¶30 In his opening brief, Stinger asserts he was deprived due process from the onset of his case on account of law enforcement filing false or misleading reports and breaching standard protocols. Stinger, however, gravely misrepresents the record[2] and not only fails to expressly request plain error review for these claims, but he fails to provide any legal analysis or authority to support the existence of error.

¶31 This Court will not consider allegations of error that are unsupported by authority. *State v. Peterson*, 2002 MT 65, ¶ 24, 309 Mont. 199, 44 P.3d 499. Thus, we decline to exercise plain error review over Stinger's unsupported allegations of police misconduct.

**Pre-Trial Judicial Bias**

¶32 In his opening brief, Stinger asserts the District Court expressed bias against him at his initial sentencing hearing when it refused to accept the State's plea agreement, and that such bias is evidenced by the District Court's express statements, which "mockingly

---

[2] For example, Stinger asserts that Deputy Sedgwick, "by his own admission," deviated from standard procedure when he interviewed Kasondra with Kiley and Jaxson present simply because Sedgwick testified that separating witnesses for interviews was standard practice. In making this assertion, Stinger fails to acknowledge that Sedgwick and Janttie interviewed Kasondra outside the vehicle and away from the children. While Sedgwick initially greeted Kasondra in front of Kiley and Jaxson, this exchange lasted all of one minute and consisted mostly of Sedgwick introducing himself and gathering basic information from the family, such as everyone's names and ages. Stinger also takes issue with Sedgwick's failure to include in his report "Jaxson's own statement that he did not get charged by [Stinger]" or "Kasondra's statement that she was the first party to instigate physicality." However, in making these assertions, Stinger conveniently ignores that Jaxson stated to Sedgwick that Stinger was "pushing [his] mom," who was standing between them, and that he had been scared that Stinger would hurt them.

14

mischaracteriz[ed]" his risk assessment and included a reference to him as "a mean, violent SOB."

¶33    A judge has a duty to always "maintain impartiality in demeanor as well as in actions." *State v. Skinner*, 2007 MT 175, ¶ 36, 338 Mont. 197, 163 P.3d 399 (citation omitted).  However, "opinions formed by [a] judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994).

¶34    A judge is also tasked with imposing criminal sentences.  Section 46-18-103, MCA.  The correctional and sentencing policy of the state of Montana provides that "[s]entencing practices must permit judicial discretion to consider aggravating and mitigating circumstances."  Section 46-18-101(2)(d), MCA.  Additionally, "[s]entencing and correctional practices must emphasize that the offender is responsible for obeying the law and must hold the offender accountable for the offender's actions."  Section 46-18-101(2)(g), MCA.  If a PSI is requested or required, a district court must consider the report prior to sentencing.  Section 46-18-111(1), MCA.  However, there is "no requirement that the sentencing judge adopt [its] recommendation."  *State v. Bar-Jonah*, 2004 MT 344, ¶ 117, 324 Mont. 278, 102 P.3d 1229.  Where a sentencing judge imposes a sentence that differs from the sentence recommended by the PSI, a sentencing judge is not required to provide reasons for the discrepancy.  *State v. McPherson*,

236 Mont. 484, 491, 771 P.2d 120, 124 (1989) (overruled on other grounds). Rather, "[t]he sentencing judge must only specify reasons why the sentence was imposed." *McPherson*, 236 Mont. at 491, 771 P.2d at 124 (quoting *State v. Stephens*, 198 Mont. 140, 146, 645 P.2d 387, 391 (1982)).

¶35 A district court also has authority to reject plea agreements. Section 46-12-211(2), MCA. Where the parties have entered a plea agreement pursuant to § 46-12-211(1)(b), MCA, a "court may accept or reject the agreement or may defer its decision as the acceptance or rejection until there has been an opportunity to consider a presentence report." Section 46-12-211(2), MCA. However, if the court rejects the plea agreement:

> The court shall, on the record, inform the parties of this fact and advise the defendant that the court is not bound by the plea agreement, afford the defendant an opportunity to withdraw the plea, and advise the defendant that . . . the disposition of the case may be less favorable to the defendant than that contemplated by the plea agreement.

Section 46-12-211(4), MCA.

¶36 Here, we agree with Stinger that the District Court's reference to him as "a mean, violent SOB" was inappropriate, but while we do not condone the remark, it was clearly premised on the facts set forth in Stinger's PSI; that is, Stinger's history of violent crimes. Further, the District Court's remarks were provided to explain its decision for rejecting the plea agreement while also meeting the requirements set forth by § 46-12-211(4), MCA. The District Court stated "I think he should get ten with seven suspended," informing Stinger that the disposition of the case was likely to be less favorable than contemplated by the plea agreement, and reasoned that it was "his third and fourth partner family member

16

assault conviction" and "his fifth and sixth felonies, including prior crimes, three counts of robbery and witness tampering," and that Stinger still "blame[d] his wife," and "minimize[d] his own behavior." To be sure that the District Court's remarks were not reflective of any deep-seated favoritism or antagonism, the court granted Stinger's motion for a continuance at the sentencing hearing, allowing Stinger additional time to complete a roofing contract and also allowing him time to contemplate going to trial. Additionally, while Stinger asserts judicial neutrality is central to due process, he fails to provide any legal argument or cite to any authority to support his unpreserved claim of judicial bias. Accordingly, we decline to invoke plain error review.

**Courtroom Proceedings and Judicial Bias**

¶37 Stinger asserts various claims based on the District Court's "lack of control" over the proceedings at trial. Specifically, Stinger asserts he was deprived due process by the District Court's failure to adequately control the proceedings, as evidenced by Kasondra's long-winded testimony as well as her testimony regarding an eye injury allegedly received from the October 27, 2022, incident. Additionally, Stinger claims the court's lack of control erroneously allowed the State to admit "unverified" photos of Kasondra's injuries and allowed jurors to potentially be exposed to extraneous information. In his reply brief, Stinger further asserts—for the first time—that in failing to control the proceedings, the District Court consistently favored the State, and in doing so, risked undermining public confidence in the fairness of the proceedings.

17

¶38 Regarding Kasondra's allegedly long-winded testimony, Stinger asserts that due to the District Court's lack of control, defense counsel was "forced to object and strike" her testimony in one instance. However, Stinger acknowledges the objection was sustained and it is unclear how his sustained objection is the basis of any alleged error on appeal.

¶39 As to Kasondra's testimony regarding her eye injury, Stinger asserts the District Court erred in allowing such testimony, because—according to Stinger—the prosecution failed to provide support as to the veracity of the claimed injury. However, in making his argument, Stinger not only fails to cite any legal argument or authority to support his claim of error, but he severely misrepresents the record and conveniently ignores Wagner's body cam footage, which clearly shows that Kasondra told Winiarski, the responding paramedic, "this eye is really screwed up from when he hit me."

¶40 Stinger also asserts the District Court lacked control over proceedings when it admitted "unverified" photographs of Kasondra's injuries. At trial, defense counsel did object to admission of the photos, claiming the State failed to establish a "chain of custody," making the photo's "unreliable." However, the District Court overruled the objection, pointing out that Kasondra had testified to the photos being true and accurate representations of her appearance the day following the October 27, 2022, incident. On appeal, Stinger asserts for the first time that admission was improper because the only foundation for the photos was by Kasondra's own testimony and, according to Stinger, Kasondra never stated that she took the photos. Stinger once again fails to provide any legal argument or cite any authority in support of his position. Further, it is well established

that a photo is adequately authenticated when a witness testifies to it being a true and accurate depiction of whatever it is that the photo is being offered to show at the time it was taken—as Kasondra did. *See* M. R. Evid. 901(a) ("The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."); M. R. Evid. 901(b) ("By way of illustration only, and not by way of limitation, the following are examples of authentication or identification conforming with the requirements of this rule: (1) Testimony of witness with knowledge. Testimony that a matter is what it is claimed to be.").

¶41 Finally, Stinger asserts he was denied due process when the District Court failed to protect the jury from inadmissible or extraneous information. Stinger points to an instance in which a single juror remained in the court room over a brief recess, as well as an instance during trial in which the District Court informed defense counsel that jurors could hear conversations taking place at the counsel table because defense counsel had left the microphone on. However, neither Stinger nor defense counsel expressed any concern regarding potential exposures to inadmissible or extraneous information when made aware of these issues at trial. On appeal, Stinger does not argue jurors were subject to such an exposure; rather, Stinger merely asserts jurors were *potentially* subject to such an exposure and fails to provide any legal argument or authority to support his claim of error. Stinger has failed to establish error such that plain error review of this claim is not necessary.

19

¶42    Accordingly, we decline to consider the merits of Stinger's allegations regarding the District Court's "lack of control" over the proceedings. Stinger has failed to support his claims with any meaningful argument or legal authority warranting plain error review.

***Napue* Claims**

¶43    Stinger asserts the State elicited testimony from Kasondra which it knew to be false but failed to correct it, violating his constitutional right to due process, pursuant to *Napue*, 360 U.S. at 266-71, 79 S. Ct. at 1175-78 (holding a defendant was denied due process by a prosecutor's failure to correct a witness's statement at trial, in which the witness denied being promised consideration in exchange for his testimony, when the prosecutor had in fact promised the witness such consideration). Specifically, Stinger asserts the State violated *Napue* when it pursued a line of questioning with Kasondra that insinuated Stinger was "shoving" her during the June 20, 2022, incident. Additionally, Stinger asserts the State violated *Napue* by eliciting testimony from Kasondra regarding her "unverified" eye injury.[3]

¶44    It is "implicit in any concept of ordered liberty" that the State may not use false evidence, including false testimony, to obtain a criminal conviction. *Napue*, 360 U.S. at

---

[3] Stinger also claimed for the first time in his reply brief that the State violated *Napue* when it played the 911 recording from the October 27, 2022 incident at trial. While we decline to address this issue being that it was raised only in Stinger's reply brief, Stinger's misrepresentation of the record in making his argument warrants correction. In the 911 recording, Kasondra told the dispatcher Stinger was subject to a "restraining order." Stinger argues this statement is false based on Deputy Rush's bodycam footage, in which Rush stated there was no record of a restraining order. However, Stinger fails to acknowledge the District Court's July 26, 2022 Order Granting Leave to File, in which the District Court specifically ordered as a condition of Stinger's pretrial release, "[Stinger] shall have no contact with [Kasondra] aside from contact for business purposes and child exchange purposes."

269, 79 S. Ct. at 1177. Accordingly, *Napue* imposes on a prosecutor an affirmative duty to correct false testimony. *Napue*, 360 U.S. at 269, 79 S. Ct. at 1177. *Napue*, however, does not create a per se rule of reversal for a prosecutor's failure to correct false testimony. *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc); *State v. Wright*, 2011 MT 92, ¶ 28, 360 Mont. 246, 253 P.3d 838. Rather, to succeed on a *Napue* claim, a defendant must show (1) the testimony at issue was actually false; (2) the prosecution knew, or should have known, that the testimony was false; and (3) the false testimony was material to the defendant's conviction. *Wright*, ¶ 28; *Gratzer v. State*, 2003 MT 169, ¶ 11, 316 Mont. 335, 71 P.3d 1221.

¶45 "A *Napue* claim never succeeds if the defendant cannot prove actual falsity." *Hampton v. Shinn*, 143 F.4th 1047, 1068 (9th Cir. 2025). Thus, "[t]estimony that is simply inconsistent or equivocal may not rise to the requisite level of falsity." *Catlin v. Broomfield*, 124 F.4th 702, 741 (9th Cir. 2024); *see Wright*, ¶ 18 (holding that DNA evidence was not outright false for *Napue* purposes despite the evidence being "internally inconsistent . . . on certain points"); *State v. Hicks*, 2006 MT 71, ¶ 26, 331 Mont. 471, 133 P.3d 206 (holding that a defendant conceded the issue of falsity for *Napue* purposes where the defendant acknowledged that "either [the witness's] testimony at trial was false or her prior statements to law enforcement were false"). Courts recognize "discrepancies in the testimony about details . . . could as easily flow from errors in recollection as from lies." *United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (overruled on other grounds); *Catlin*, 124 F.4th at 741. Therefore, "[m]ere inconsistencies or honestly

21

mistaken witness recollections generally do not satisfy the falsehood requirement." *United States v. Renzi*, 769 F.3d 731, 752 (9th Cir. 2014).

¶46    Here, Stinger's allegations of falsity are premised entirely on Kasondra's statements at trial being inconsistent with her prior statements to law enforcement. Stinger specifically takes issue with the prosecutor asking Kasondra about being "shoved" by Stinger because, according to Stinger, Kasondra told law enforcement on June 20, 2022, that Stinger was "charging" Jaxson when she "pushed" him back, making her the initiator of the physical aggression. However, on direct examination, Kasondra testified Stinger charged Jaxson, and she got between the two and was "trying to, like, push him back away from Jaxson." While she later stated on cross-examination, "I don't recall ever pushing [Stinger]," Kasondra clarified on re-direct by explaining that when she said "push" she was referring "to [Stinger] trying to push past [her] or around and through [her] to get to [Jaxson]," and that she was "putting [her] hands up to keep him off of [Jaxson]," as Stinger was trying to "push by [her] to get to [Jaxson]." Kasondra has consistently maintained that she pushed Stinger back as he charged towards Jaxson. Further, Jaxson stated to Sedgwick that Stinger was "pushing [his] mom." Thus, Stinger has failed to even establish that Kasondra's statements regarding "pushing" and "shoving" were inconsistent, let alone actually false, as required by *Napue*.

¶47    Next, Stinger asserts the State sanctioned false testimony by questioning Kasondra about an eye injury that allegedly occurred as a result of the October 27, 2022 incident. According to Stinger, "[a]t trial, Kasondra's version of how the altercation proceeded, and

22

what injuries she sustained, was different from the version she told law enforcement." First, Stinger takes issue with Kasondra's testimony, in which she stated Stinger punched her "in the left side of [her] face in the eye" before placing her in a head lock, on the basis that Kasondra reported to Wagner on October 27, 2022, that Stinger put her in a headlock before he punched her in the head multiple times. Stinger further asserts Kasondra's testimony regarding her eye injury and subsequent treatment was false because "Kasondra apparently had no complaints of injury to the responding medical technicians on October 27," and because Deputy Wagner "saw no evidence of injury to Kasondra's eye" and "[Kasondra] never mentioned being struck in the face or her eye."

¶48 Not only does Stinger once again assert actual falsity based on mere inconsistency, but in making these arguments, Stinger himself falsely represents the record. While Wagner did state in his report, as well as in his testimony, that he did not observe any injury to Kasondra's eye, Stinger ignores that Kasondra repeatedly told Wagner she was punched in the head—the place where one's eyes are located. And while Stinger claims that Kasondra reported no injuries to responding medical personnel, footage from Wagner's body camera establishes she told Winiarski, the paramedic on scene, "this eye is really screwed up from when he hit me." Further, Winiarski's testimony expressly disagreed with defense counsel's assertion that Kasondra reported no injuries. While a report from Frenchtown Fire referenced by defense counsel quoted Kasondra as stating, "no complaints just feeling shook up," Winiarski explained he did not write that portion of the report and he did not hear Kasondra state those words. Winiarski stressed that he wrote a separate

23

report which appeared to be excluded from the portion referenced by defense counsel. Further, Winiarski testified to Kasondra's face and neck being red and puffy in a manner consistent with strangulation and, based on his evaluation, he could not rule out that she had been punched in the face.

¶49    While there may be some minor inconsistencies between Kasondra's statements at trial with her prior statements to law enforcement, specifically, as to whether Stinger punched her before placing her in a head lock or after, Stinger fails to establish Kasondra's testimony as "actually false." Accordingly, Stinger fails to establish a viable *Napue* claim.

¶50    *2. Whether the cumulative effect of errors warrants a new trial.*

¶51    Finally, Stinger asserts reversal is mandated under this Court's cumulative error doctrine because the aggregate effect of his claimed errors denied him of his right to a fair trial. We apply the cumulative error doctrine only in "the rare case in which several errors occur, the cumulative effect of which is to deny the defendant the right to a fair trial." *Burrington*, ¶ 41. For reversal to be warranted under the doctrine, a defendant must "prove that the aggregate effect of the errors denied him a fair trial—mere allegations and speculation that prejudice occurred are insufficient." *Burrington*, ¶ 41 (citations omitted).

¶52    Here, Stinger has failed to establish that any of his claims even amount to error, let alone that, taken together, they cumulatively prejudice his right to a fair trial. Stinger had the opportunity to cross-examine witnesses regarding their prior statements and any discrepancies in their testimony. Stinger also had ample opportunity to address any

24

concerns of judicial bias and the management of trial proceedings. Stinger received a fair trial. Accordingly, he has failed to show error or cumulative prejudice.

**CONCLUSION**

¶53    Judgment is affirmed.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ KATHERINE M. BIDEGARAY
/S/ BETH BAKER
/S/ JIM RICE